Suit by Gulf Breeze Cottages, Inc., against Glens Falls Insurance Company and others for revision of awards made by appraisers and umpire as to liability under wind and hail insurance policies and recovery of any sum found due under policies. From an adverse decree, defendants appeal.
Decree affirmed.
No question of pleading is presented in this case, and there is no serious dispute about the salient facts.
The appellee owned a number of beach cottages, of two types, which were insured severally by the appellants against loss resulting from wind and hail. The buildings were damaged by a hailstorm and, after an interval of six months, by a hurricane. The owner and the various companies could not agree about the proper amount of reimbursement; so the companies appointed an appraiser, as did the owner. These two failed to concur in the choice of an umpire, and one was designated by the court. After an examination of the buildings, in a manner which is not questioned here, these three men fixed the "sound value" of each of one class of buildings at $2,800 and of each of the other at $2,600.
Every one of the policies contained a co-insurance clause stating that it was a part of the consideration of the contract, a basis for the premium, that the insured should at all times maintain windstorm and hail insurance on each item of not less than fifty per cent of its cash value and that upon the insured's failure to do this he should become an insurer to the extent of the deficit and should then bear his proportion of the insurance for such a loss. Consequently if the above values should be adopted the co-insurance clause would become effective because on the former class of buildings the insurance carried was but $1,100 and on the latter only $1,000.
The owner was dissatisfied with the awards of the appraisers and the umpire, whereupon he brought suit against them and the insurers, seeking a revision of the awards and the payment of any sums found by the court to be properly due.
The chancellor found that the calculations were erroneous because the amount of partial reparable loss to the roofs of the structures had been established by taking depreciation into account and "sound value" had been fixed by adopting the probable *Page 829 
cost of replacement in new materials without allowance for depreciation. It was his thought that the correct measure of compensation for partial loss would be the cost of economical repair, not exceeding, however, the value, and that "sound value" should be arrived at by replacement cost, less depreciation. On the basis of these convictions he ordered a revision of the awards so that the "sound value" of each structure would be determined by using a depreciation figure of twenty-seven per cent (three per cent for each of the nine years the buildings had been in existence) and depreciation of 9/15 would be eliminated in fixing damage to roofs. Parenthetically, the fraction "9/15" simply means the ratio of the age of the roof to the life of the roof.
Considering first the method announced by the chancellor for the determination of the "sound value," we have no cause to disturb his conclusion that a depreciation of three per cent a year for nine years was fair. He was warranted in relying on the testimony of one of appellants' own witnesses that in view of the location of the buildings, this depreciation should be computed on the basis of three per cent annually. If the cost of replacing the two classes of property, as fixed by the appraisers and the umpire, is reduced by twenty-seven per cent, obviously the remainder will be less than twice the amount of insurance against loss by windstorm and hail; so the co-insurance clause would not come into play.
Another question posed by appellants is substantially this: Should they be "required to pay the entire cost of replacing"
roofs approximately ten years old which had been originally designed to last ten years, without being credited with depreciation? The question is restated by appellee: "When insured structures suffer damage far less than total loss, appropriately compensable only by repair, is the measure of indemnity the cost of repair, necessary to render the structure habitable, rather than cost of repair less depreciation?" (Italics supplied)
At a glance it would seem that the questions are based on different premises, for the one bears reference to entire cost of replacement; the other, to "cost of repair." Both probably present the same point, for the chancellor found that there was only a partial loss "susceptible of repair" by "recovering of the roofs of the structures," to quote from the decree. From this we understand that "replacement" as used by one party and "repair" as used by the other both refer to the actual roofing as distinguished from the construction necessary to carry the same upon the walls. The chancellor decided that compensation for damage to this roofing should be the amount required to make the most economical repair, without applying depreciation.
The appellants urge us to make a distinction between the damage to a roof and to other parts of a building, going so far as to say that no contention is made that depreciation should be allowed on repairs to the "main portions" of a building damaged by windstorm; that even though the other parts of the building repaired after damage from a storm would be in better condition than before repair, nevertheless the insurer should not be relieved of his duty to make those repairs. Of course to the insurer there may be reason, from a practical standpoint, why the roof of a building might fall into a separate category, that being the part of the building which always feels the full force of the elements, but we must take into consideration the protection which is sought and granted when an insurance company contracts with an owner of property to insure him against loss.
The appellants and the appellee agree, and the chancellor announced, that the contract was one of indemnity. Appellants themselves in their brief concede that in the case of partial loss it is the duty of the insurer to restore the property to its condition prior to the loss (if the cost of doing so does not exceed the amount of the insurance), although the cost of doing this "is proportionately more than the amount of damage bears to the value of the insured building." Appellants do not dispute the soundness of that rule. In a contract of that character the companies undertook to save the owner from harm *Page 830 
caused by ravages of storm, and we think the responsibility obtained without distinction between the roof and the remaining components of the structure. We are not referred to any provision of the contract making any such distinction.
Since the buildings were only partially destroyed, it was all the more necessary, for the reasons we have given, that the roofs should be in good condition in order that the structures might remain habitable, and there seems no occasion for holding that, although the repair of other parts places them in better condition than they were before the damage, a different yardstick should be employed in measuring the amount due for the repair of roofs.
Strangely enough there is a dearth of authority on the subject. See annotation following McIntosh v. Hartford Fire Insurance Company, 106 Mont. 434, 78 P.2d 82, 115 A.L.R. 1164.
Bearing in mind that the purpose of the contract was to indemnify the owner against loss, we think the chancellor adopted a rule which was fair and just and that the property should have been placed in as nearly as possible the same condition that it was before the loss, without allowing depreciation for the materials used. Certainly it was not intended that the repairs should be made with materials which were not new. If depreciation were allowed, it would cast upon the owner an added expense which we do not believe was contemplated by the parties when they entered into the insurance contract.
Much of appellants' brief is devoted to the first question posed by them, which constitutes a challenge to the bill as being inappropriate in view of the provisions of Section 57.01 et seq., Florida Statutes, 1941, and F.S.A., dealing with arbitration. They take the position that the bill in the instant case contains no charges of fraud, corruption, gross negligence, or misbehavior of either of the arbitrators or of the umpire or any "evident" mistake acknowledged by either of them, and they base this attack on Section 57.07, where this language may be found. They concede that the award in the present case was not "made a rule of court," but they insist, nonetheless, that the provision of Section 57.07 that an award of arbitration shall be set aside by the court only on the grounds we have just detailed applies whether the arbitration is one made a rule of court or not.
To determine this it is necessary to consider all the sections of Chapter 57, and after studying them we are unable to agree with the appellants. The first section, F.S.A. § 57.01, granting the privilege of the parties in any controversy of making a rule of court any arbitration to which they wish to submit their differences, ends with the significant sentence, "However, any party to a submission not made a rule of court may seek relief in the courts." (Italics supplied.) This indicates that there may be two kinds of submission, one made a rule of court and one not given that dignity. Then follows the procedure for making an arbitration a rule of court. There must be a written statement, signed by the parties, containing certain pertinent information, which statement must be recorded in the minutes of the court. Section 57.02. When this first step is taken the arbitrators and the umpire are required to take an oath that they will properly perform their services. Section 57.03. There follow provisions for the examination of witnesses under oath; for the issuance by the arbitrators of subpoenas compelling the attendance of witnesses; and for the service of subpoenas by the sheriff or the constable of the county. When the award is made it must be written, signed by the parties and the umpire, and recorded in the court "of which the arbitration is a rule," and the clerk must give notice of the entry to the persons against whom the award is rendered. Section 57.05. Any party affected by the award may "apply to the court of which the submission is a rule, by motion, to set aside the award" on giving the opposite party a certain notice. Section 57.06. (Italics supplied.) Obviously the provisions of this section apply only to those awards which are made a rule of court, and it is our conclusion that the grounds appearing in the following section 57.07, are the ones to which such a motion is restricted.
It will be seen by this cursory review of this chapter that considerable formality is *Page 831 
required to make an arbitration a rule of court and that not only do the arbitrators and the umpire take a solemn oath, but they are granted certain powers with reference to the conducting of examinations and the subpoenaing of witnesses. When the award is made, it becomes a matter of record, and then a ruling may be secured from the court on a simple motion to set the award aside.
Turning to the last section in the chapter, F.S.A., § 57.09, we find that an award so "entered of record" has the force of a judgment from the time of its entry, so far as the payment of money is concerned, upon which an execution may issue; and so far as the performance of any act is concerned, a party failing to comply is subject to prosecution for contempt of court and to imprisonment if he is found to have disobeyed the order.
Bearing in mind the formality of the proceedings, we think the language of Section 57.07 detailing those grounds which alone justify setting aside the award applies only to awards made in arbitrations which have been made a rule of court, and that in a case like this, where there was no attempt to give it that dignity, a party to a submission not made a rule of court (Section 57.01) may seek the relief which is asked in this case, since there was no supervision by the court of the arbitration agreement between the owner and the insurance companies.
The decree is affirmed.
ADAMS, C.J., and TERRELL and BARNS, JJ., concur.