**Sture V. SIGFRED, Appellant,**

v.

**PAN AMERICAN WORLD AIRWAYS,**
Inc., Appellee.

No. 15490.

United States Court of Appeals
Fifth Circuit.

Jan. 19, 1956.

Rehearing Denied Feb. 21, 1956.

14

Brown, Circuit Judge, dissented.
See also D.C., 122 F.Supp. 881.

Laurence A. Schroeder, Miami, Fla., Walton, Lantaff, Schroeder, Atkins, Carson & Wahl, Miami, Fla., of counsel, for appellant.

David W. Dyer and Douglas D. Batchelor, Miami, Fla., Smathers, Thompson, Maxwell & Dyer, Miami, Fla., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal presents questions regarding the reviewability of the award of an air carrier board of adjustment, established pursuant to Section 204 of the Railway Labor Act as amended, 45 U.S.C.A. § 184, and the interpretation of a collective bargaining agreement entered into between the Air Line Pilots

Association International and Pan American World Airways, Inc. In 1950, appellant Sigfred, a pilot with more than twenty years' service with Pan American, suffered an ear injury which caused him occasional dizziness while in flight and resulted in the company grounding him for varying periods of time during that year. Medical examination later disclosed that he was unfit for further flight duty and on March 29, 1951, the company advised him that since there were no other available jobs for which he was qualified, he would be discharged from its service effective April 1, 1951. Under Section 25 of the collective bargaining agreement between the Air Line Pilots Association International and Pan American, the company paid Sigfred his full salary while he remained in its employ, but since his discharge it has refused to make any further payments. Sigfred claims here that, in accordance with Section 25,[1] he is entitled to his full salary for as long as his disability continues, for the balance of his life if it lasts that long.

On April 27, 1951, Sigfred brought suit against Pan American in a Florida court for a decree declaring his rights under the collective bargaining agreement. The company removed the case to federal district court, which dismissed the complaint without prejudice, holding that jurisdiction should be declined until the plaintiff should exhaust his administrative remedies under the Railway Labor Act or elect to pursue "his statutory or Common Law remedy for breach of contract for wrongful discharge." Sigfred then filed a claim for workmen's compensation with the Florida Industrial Commission, and obtained an award to the effect that his disablement was a result of an occupational injury.

This having been established, he reasserted his claim with the company that it pay him his full salary. The company denied liability beyond workmen's compensation, and an appeal was taken to the Pilots' System Board of Adjustment, which disallowed the claim. Sigfred then brought the present action in district court, challenging the board's construction of the collective bargaining agreement and seeking damages in the amount of his salary from April 1, 1951 until the filing of the complaint. The district court dismissed the complaint on the ground that the board's interpretation of the contract was correct, and Sigfred brings this appeal.

The company argues that the judgment must be affirmed because the plaintiff elected to pursue the administrative route through to an award by the system board, which is made "final and binding," by the collective bargaining agreement; and because in any event both the board and the court properly interpreted the agreement as not allowing recovery. Sigfred contends that his election to pursue his remedy to the Pilots' System Board of Adjustment was not voluntary, but pursuant to Florida law; that Florida law governs the reviewability of the board's award; that under the Florida rule of reviewability of arbitration awards all pure questions of law may be reexamined by the reviewing court, and that a consideration

1. This provides:
"Sickness or Injury
"Section 25.
"(a) The Company will provide or compensate the pilot for the cost of complete medical care for occupational sickness or injury. In the event of non-occupational injury or illness occurring while on assignment at a point other than the pilot's base station, or outside the Continental United States, the Company agrees to reimburse the pilot for such additional expenses occasioned by the pilot's location at the time of such injury or illness. During such period the pilot's salary will be continued and the pilot agrees that all workmen's compensation benefits due under applicable laws shall be paid by the pilot to the Company.
"(b) Pilots may be granted full salary during periods of sickness or injury while at their base station. When such salary is granted the pilot agrees that all workmen's compensation benefits due under applicable law to the pilot shall be paid to the Company."

of the board's interpretation of the agreement will reveal it to be patently erroneous.

Without expressing any opinion on the first of these propositions, a matter not entirely free from doubt under Florida law,[2] we may proceed to an examination of the second, viz., that Florida law governs the reviewability of the board's award. The establishment of boards of this type is authorized under the 1936 amendments to the Railway Labor Act, extending many of the provisions of that Act to air carriers in interstate and foreign commerce. 45 U.S.C.A. § 181. The Act as originally passed stated among its general purposes the avoidance of any interruption to commerce and the providing for the prompt and orderly settlement of labor disputes, including those arising out of the interpretation or application of collective bargaining agreements. 45 U.S.C.A. § 151a. Pursuant to these aims, Congress provided that disputes concerning the interpretation of collective bargaining agreements in rail transportation are to be "handled in the usual manner up to and including the chief operating officer of the carrier", but that if no adjustment is reached at this level, they can then be referred by petition of either party to a division of the National Railroad Adjustment Board, whose decision, except insofar as it contains a money award, is final and binding. 45 U.S.C.A. § 153, First (i, m). It also provided, however, that any carrier, system, or group of carriers and their employees may establish system, group or regional boards for the deciding of disputes of the same character, with the express provision in the statute that if either party to such an arrangement becomes dissatisfied therewith, it may elect upon ninety days' notice to come under the jurisdiction of the national Adjustment Board. 45 U.S.C.A. § 153 "Second."

The 1936 amendments, in extending many provisions of the Act to air carriers, did not provide for the immediate establishment of a National Air Transport Adjustment Board. 45 U.S.C.A. § 185. Instead, Congress provided that such a board should be set up when "it shall be necessary", "in the judgment of the National Mediation Board." 45 U.S.C.A. § 185. It expressly applied to air carriers that section declaring it to be the duty of carriers and employees "to exert every reasonable effort to make and maintain" collective bargaining agreements. 45 U.S.C.A. § 181. It also made it the duty of every carrier and its employees to establish a board of adjustment with jurisdiction not exceeding that of the system, group and regional boards created in rail transportation under the original Act. 45 U.S.C.A. § 184. Finally, Congress required that disputes be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes, with the added proviso that failing adjustment in this manner, the dispute may then be referred by petition of either party "to an appropriate adjustment board." 45 U.S.C.A. § 184.

The question in this case is whether Florida law or federal law governs the reviewability of an award made by such a board in interpreting a collective bargaining agreement negotiated under the duty to bargain imposed on air carriers and their employees by the Act. Florida law makes unenforceable any agreement to arbitrate future disputes[3] and thus would strike down the provision in the agreement that awards of the Pilots' System Board of Adjustment shall be final and binding. Appellant urges that it likewise allows the review of any pure question of law. However tenuous the distinction between so-called "unmixed" questions of law and those requiring the deciding of a factual issue also, the appellant

---

2. See Mountain v. National Airlines, Inc., Fla., 75 So.2d 574.

3. Glens Falls Ins. Co. v. Gulf Breeze Cottages, Fla., 38 So.2d 828.

contends that we have such a pure question of law before us here in the problem of interpreting the collective bargaining agreement.

Without passing on the issue of whether such a rule exists in Florida, it becomes plain upon a moment's reflection that such a system of review would completely sweep aside Congress's efforts to provide for a prompt and orderly settlement of labor disputes by system boards of adjustment. Moreover, such a result would obtain solely as a matter of compliance with Florida's contrary policy of allowing disputants a court review of their disputes, regardless of their agreements to arbitrate those questions with finality. It would rest the effectiveness of the statutory plan upon the variegated characteristics of state law, and eventually lead to the anomaly of a National Air Transport Adjustment Board whose decisions, except in awarding money, *must* be final,[4] existing alongside coordinate system boards in Florida whose decisions cannot be final. Although the parties could achieve what they have here sought, a final decision by a board versed in the problems of the industry, by electing to come under the national board,[5] they would lose thereby whatever advantages there are in operating under a board established by a single carrier and its employees.

■■■ We see no reason to force such an election. Congress having required the negotiation of collective bargaining agreements, and the establishment of boards of adjustment to interpret them, we deem it a reasonable corollary thereto that it intended that the scope of review in appeals from these boards should be determined by federal courts, applying federal law. In the light of the declared aims of the Act, we also find it to be the intent of Congress to allow the parties to make the awards of such boards final and binding. Therefore, giving normal effect to these words, we refuse to review a challenged ruling of law, there being no question raised regarding the jurisdiction of the board or the regularity of its proceeding. James Richardson & Sons v. W. E. Hedger Transportation Corp., 2 Cir., 98 F.2d 55.

However, it was urged upon the district court that the system board's construction of the agreement is arbitrary and capricious. If we regard this as an assertion that the board's arbitrariness rose to the level of a denial of due process, it is not amiss to add that we regard the board's interpretation of the agreement not only entirely reasonable, but we believe it to be the correct interpretation. The language in question reads as follows:

"The Company will provide or compensate the pilot for the cost of complete medical care for occupational sickness or injury. In the event of non-occupational injury or illness occurring while on assignment at a point other than the pilot's base station, or outside the Continental United States, the Company agrees to reimburse the pilot for such additional expenses occasioned by the pilot's location at the time of such injury or illness. During such period the pilot's salary will be continued and the pilot agrees that all workmen's compensation benefits due under applicable laws shall be paid by the pilot to the Company."

The arguments of counsel debate whether the third sentence of the section refers to the second sentence or to the first sentence as well. The company argues that the words, "During such period," at the beginning of the third sentence, by their natural sense refer to the period mentioned in the immediately preceding sentence. It is significant that it is only the second sentence that makes a reference to time ("while on assignment at a point * * *" etc.). Sigfred urges that such an interpretation is patently erroneous

---

**4.** 45 U.S.C.A. § 185.

**5.** Ibid.

because a pilot would then draw full salary during periods of non-occupational injury, but only workmen's compensation during periods of occupational injury. Therefore, he reasons, sentence 3 must refer also to sentence 1, granting full salary during the period of any occupational injury.

We perceive in this agreement, as construed by the arbitration board, a clearly understandable and helpful policy of the company. It provides that when a pilot is away from home, and it is of peculiar value when he is in a foreign country, he is protected in his salary if mishap befalls him, whether or not such mishap is occupational. Instead of providing for the cost of complete medical care, as is provided for in the case of occupational sickness or injury, this provision takes care of such "additional expenses" beyond what he would be put to if he were at his home base, thus excluding reimbursement for medical treatment if such medical treatment is not more expensive on account of the pilot's being away from home. It then provides the further assurance, partially, no doubt, because of the failure to provide complete medical care, that during such period his salary will be continued.

The construction of this paragraph in the manner contended for by the appellant would amount to providing a guaranteed full salary payment for life in the event of any permanent occupational disability that disqualified the pilot from passing a rigid physical examination. Of course, such a provision could be included in a collective bargaining agreement. But if it were it is not too much to assume that it would be in such terms and with such clarity that there could be no doubt about its meaning. We think it also appropriate to remark that in those exceptions to the normal subjects covered by collective bargaining agreements in which provision is made for benefits after employment ceases, the provisions relating to such pensions are usually carefully spelled out in the agreement, as they should be.

■ Without, therefore, making a choice between the alternative constructions, since we find that the complaint failed to set out a cause of action for review of the action of the board, we nevertheless express the conviction that the arbitrators could not easily have yielded to a construction that would require the company to pay a pension of the full $13,440 annual salary to all pilots who no longer meet rigid flight medical requirements for as long as their disability exists. Certainly we cannot strike down as arbitrary an award which refused to make such an interpretation.

■ It is finally argued that not every employer-employee dispute falls within the exclusive jurisdiction of the system board. Thus, it was held in Moore v. Illinois Cent. R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, that a suit under state law for wrongful discharge could be brought by a former employee, despite the fact that he might also have a right to reinstatement and back pay under the collective bargaining agreement. However, in Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795, the Supreme Court held that a state court has no power to declare rights under a collective bargaining agreement negotiated under the Act, since the statutory procedure in such cases is exclusive. The appellant here does not claim that he was wrongfully discharged (in fact, he concedes that he was not), and does not assert a cause of action arising out of any rights except those created by the collective bargaining agreement. The interpretation of such an agreement was held by the Slocum case to be within the exclusive jurisdiction of the statutory board there involved. The construction of this agreement was therefore correctly referred to the Pilots' System Board of Adjustment, and since, as noted above, its award presents no reviewable question of law, the district

court's dismissal of appellant's complaint was correct.

The judgment is

Affirmed.

BROWN, Circuit Judge (dissenting).

While I differ finally from the majority on the interpretation of the contract, the difficulties on any interpretation of of it and doubts about the final correct one are such that, standing alone, I would not have thought my contrary views sufficiently well founded to outweigh the collective judgment of my associates or move me to dissent. But there is much more to this case than that—much more than the able opinion of Judge Tuttle reflects.

I would accept their interpretation of this contract, or for that matter the district judge's alone, had there ever been one. The trouble is that here, and below, all that Sigfred got was a "but if" opinion—the award of the Adjustment Board construing the contract is not subject to review *but if* it were, we would agree. But Sigfred is entitled to more than a "but if" adjudication. Had he gotten that I would again have submerged my own small differences and would have joined in an unanimous decision.

Had some effective right of judicial review been recognized, I would have accepted also the thesis that the claim must be tested by Federal, not Florida, law, although the approach of Judge Tuttle seems to me to place responsibility entirely on the appellant's contentions instead of the historical fact that the Supreme Court, not Sigfred, in Moore, and revived in Koppal, imported state principles into these problems arising under the Railway Labor Act.

But the Court by-passes these important matters altogether. It does not even discuss the basic notion of the necessity for some character of judicial review even though that has been expressly left open by the Supreme Court. And, under the severe limitation of space imposed upon appellate opinions, it compresses the problem into a nice academic inquiry to the point that it loses nearly all of the essential flesh *to give it life, especially in terms of* agonizing, tactical-strategic problems facing diligent counsel as they attempt to chart the course for passage between Moore-Koppal versus Slocum, State versus Federal, Voluntary versus Involuntary administrative remedy—a task which, in contrast, makes the classic figure of Odysseus between Scylla and Charybdis quite unforeboding.

In view of this, some elaboration of my views may be justified.

After 21 years of faithful service as Chief Pilot with a ranking of 19 out of 1200 on the seniority roster, Captain Sigfred became a casualty of his own air age when airotitis media—an occupational disturbance of the ears—made him, Pan American doctors declared, "permanently disqualified for flight status with this Company." Discharged on April 1, 1951, he has, with tenacious persistence, twice in State Courts of Florida, twice in Florida Federal Courts, once in a Florida administrative agency, and twice in the administrative forum of a Railway Board of Adjustment, sought a judicial determination of his contention that, having spent his life for the Company, it is obligated, under the Collective Bargaining Contract[1]

---

1. On its merits, the case turns on the application of § 25 of the Contract dated October 14, 1950. As this involves interrelation of various sentences, I have, to facilitate cross reference, numbered each sentence in brackets [ ].

"Section 25.

[1] "(a) The Company will provide or compensate the pilot for the cost of complete medical care for occupational sickness or injury. [2] In the event of nonoccupational injury or illness occurring while on assignment at a point other than the pilot's base station, or outside the Continental United States, the Company agrees to reimburse the pilot for such additional expenses occasioned by the pilot's location at the time of such injury.

with the Pilots' Union, ALPA, to pay medical expenses and, most important, his salary during the continuance of such occupational disability.

or illness. [3] During such period the pilot's salary will be continued and the pilot agrees that all workmen's compensation benefits due under applicable law shall be paid by the pilot to the Company.

■ "(b) Pilots may be granted full salary during periods of sickness or injury while at their base station. [5] When such salary is granted the pilot agrees that all workmen's compensation benefits due under applicable law to the pilot shall be paid to the Company.

■ "(c) The standard per diem allowance will be continued, or room and board will be provided in quarters designated by the Company, until the pilot returns to his base station if he becomes sick or injured while en route."

Section 28 may also have some bearing: "Workmen's compensation benefits will be provided for the pilots by the Company in amounts not less than those prescribed by the Longshoremen's and Harbor Workers' Compensation Act, as amended [33 U.S.C.A. § 901 et seq.], or the Workmen's Compensation Law of the state having jurisdiction whichever act provides the higher benefits. The monetary benefits so paid shall be in addition to any monetary benefits paid pursuant to the provisions of Sections 29 and 30 hereof, and will be paid to the beneficiaries prescribed by the applicable law."

2. April 1, 1951, to June 1, 1954, 38 months at $1120.00 per month. In the earlier action filed April 1951, State Court of Florida and removed to Federal Court, he sought also declaratory relief construing the contract § 25(a), (b), supra.

3. Those who champion the administrative, non-judicial course, as speedy, inexpensive justice (cf. opinion by Judge, later, Justice Rutledge in Washington Terminal Co. v. Boswell, 75 U.S.App.D.C. 1, 124 F.2d 235, and Justice Jackson's description of "hoary litigation" Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788), find no helpful illustration here:

April 4, 1951, 4 days after discharge Sigfred requested contract hearing under § 22(a) (1), which company declined as not appropriate in view medical discharge, and suggested review under § 26, Medical Disagreements.

In this final action, filed in the Court below June 17, 1954, Sigfred sought a money judgment only for his back pay.[2] The complaint detailed historically his Pilgrim's Progress[3] including, of course,

April 22, 1951 Sigfred filed State Court, Florida, in Chancery, bill for declaratory decree, construction of § 25(a) of the contract; removed by defendant to Federal Court (Civil Action 3774). July 30, 1951, dismissed on Pan American's motion "jurisdiction should be declined until the plaintiff has exhausted his remedies under the agreement * * * and the Railway Labor Act, or elects his statutory or Common Law remedy for breach of contract for wrongful discharge." October 2, 1951, Sigfred expressly requested compliance § 25(a) for medical expense, salary past and future, which company rejected October 9 stating no reimbursement required by Sigfred for Florida compensation, (Section 28) as his medical condition "is not compensable." October 15, 1951, Sigfred filed appeal, § 23, with Division Chief Pilot, which was ignored. November 5, 1951, Sigfred filed appeal with Toomey, Division Manager, under § 22(b), from failure and refusal of Division Chief Pilot to grant hearing on the grievance. This was denied November 15, 1951, on the ground there was, "no basis for a hearing under Section 22(a) * * *." As Company, October 9, 1951, asserted medical condition was not compensable, Sigfred filed claim Florida Industrial Commission December 1, 1951, for compensation benefits to enable him to reimburse company for benefits received § 25(a) (b).

The next step was submission December 16, 1951, by President, ALPA, to System Board of Adjustment (45 U.S.C.A. § 184) on Sigfred's behalf for compliance § 25(a). February 11, 1952, submission withdrawn without prejudice by ALPA to permit determination Florida compensation case.

Compensation case heard before Deputy Commissioner February to May 1952; award by Deputy Commissioner holding occupational disability September 18, 1952, appealed by company (insurance carrier) to Full board, affirmed March 23, 1953, affirmed Florida Circuit Court July 13, 1953, appeal dismissed by Florida Supreme Court October 23, 1953. Pan American Airways v. Sigfried, Fla., 71 So.2d 913.

November 5, 1953, Sigfred, referring to the Compensation holding that his condition was occupational disability, re-

the final decision of the Pilots' System Board of Adjustment [4] which he attacked as arbitrary, unsupported by, and contrary to law, especially in the light of an admitted service-connected, occupationally precipitated disability.[5] The

newed request for benefits under § 25(a) and compliance with contract. November 10, 1953, President, ALPA, reinstated submission to System Board of Adjustment. January 5, 1954, February 22, 1954, March 22, 1954, Sigfred requested advices from company and tenders compensation payments; all ignored.

May 17, 1954, System Board of Adjustment issued award that Sigfred does not have a valid claim for payment of salary as § 25(b) is applicable and governs; medical expenses were, however, allowed.

June 17, 1954, Civil Action 5648 (this suit) was instituted below.

4. In order to handle matters not disposed of under contract grievance machinery, Pan American and ALPA, pursuant to mandatory requirements of Railway Labor Act, 45 U.S.C.A. §§ 181, 184, by separate agreement June 16, 1945, established a System Board of Adjustment "for the purpose of adjusting and deciding disputes which may arise under the terms" of, and with jurisdiction over disputes "growing out of grievances or out of interpretation or application of any" of the terms of the Collective Bargaining Agreement. The Board was bipartisan, two members each from ALPA and the company, and provided:

"(1) Decision of the Board in all cases properly referable to it shall be final and binding upon the parties hereto.
*  *  *  *  *
"(n) Nothing herein shall be construed to limit, restrict or abridge the rights or privileges accorded either to the employees or to the employer * * * under the Railway Labor Act."

5. Sigfred insists that if his quest for legal satisfaction was disheartening, it was but the epilogue to earlier and discouraging efforts for medical relief. This summary is drawn entirely from the detailed Award of the Deputy Commissioner, Florida Industrial Commission, affirmed by Florida Courts which, on usual principles of res judicata, is binding since Pan American, a named party with Sigfred and the insurance carrier, had a direct liability under the Compensation Act, Florida Statutes Annotated §§ 440.01, 440.10, 440.20 (4), 440.25(2), 440.25(3) (b) (c), 440.-38, 440.43.

During two flights December 1949 to Brazil, Sigfred had a bad cold, had received penicillin treatment between flights, and on the last day of return trip, had experienced severe pain as he descended from high altitude. Upon examination his ears were found blocked. He was in bed about two weeks undergoing penicillin and air pressure treatment to unblock the eustachian tubes. Company doctor Mansfield diagnosed it as moderately severe airotitis. When the tubes became unblocked, early February 1950, Doctor Mansfield ordered resumption of flying as the only way to determine whether the cure was satisfactory, likewise ordering the extraction of Sigfred's teeth which was done between then and May 1950. Sigfred, attempting to fly as ordered, experienced excruciating pain on trip to Brazil, February 14, 1950, was relieved at San Juan, P.R., upon return was treated by Doctor Mansfield about two weeks, again released for flight duty, and ears became blocked again on flight to Columbia, S.A. About mid April, Doctor Mansfield, discontinuing radium treatments, again released Sigfred for flight duty prescribing pressurized cabins with few landings (instructions never complied with), but on return from flights to Puerto Rico, Brazil, the Miami first aid station, finding his ears blocked again, grounded him and returned him to Doctor Mansfield.

The Deputy Commissioner's Award describes this event: "On this visit, Doctor Mansfield told him that he defied any doctor to find anything wrong with [his] ears. The doctor accused [Sigfred] of laying down on the job, and told him that if he didn't start flying like everyone else he should either resign or the company would take away his retirement benefits. Thereupon, Doctor Mansfield put him back on flight status * * *."

On his next flight, three days later, he again had severe pain, and upon returning the company nurse, finding a blood clot on the right eardrum, grounded him. Doctor Oliver, an ear specialist, was called in but found nothing, again released Sigfred for flight duty recommending short trips with few landings. The period between then and September 24, 1950, is characterized by the Award: " * * * suffice it to say that the routine of unsuccessful medical treatment, resumption of flight status, and continuing and increasing pain culminated in * * * [Sigfred's] discharge. The record * * is replete with instances of [Sigfred]

trial judge, treating it as both an appeal from the Adjustment Board and suit for breach of the contract, denied relief apparently on the dual ground that, if reviewable at all, the Adjustment Board's decision was correct since it conformed to his own independent interpretation of the contract that payment of salary (as distinguished from medical expense) was not required by 25(a) and was permissive under 25(b). Pan American urges both to sustain the decision.

In our task, as I view it, we cannot reach the merits, to approve or disapprove the holding unless there were a justiciable case before the district court. We are forced, and ought therefore, to examine into the complex field of the availability, use, exhaustion and finality of any existing administrative remedies.

This involves this further process: Was Sigfred's claim a Moore or Slocum case?[6] If Moore: (a) Did Florida law require him to exhaust the administrative remedies under collective bargaining contract and System Board of Adjustment, if so, was adverse award by Board binding at all, and by what standards, State or Federal, is this to be determined? (b) If exhaustion of remedies was not required, was his pursuit of them voluntary; and, if so, is he bound; if not, what is the extent of the review and by what standards, State or Federal, is it to be determined? If Slocum: (a) Is the award reviewable by the terms of the statute Railway Labor Act? (b) If not, must a right of review be implied, and if so, what is the extent of the review?

## I.

If form alone controls, this is not a Moore case for while the administrative contract grievance machinery was first invoked because of Sigfred's discharge April 1, 1951, the issue presented through the Adjustment Board and in both Civil Actions was the obligation,

---

being ordered to fly over his protest that he was physically unfit." On the latter date, returning from foreign flight during which he had suffered dizziness and lost equilibrium in leaving the cockpit, Sigfred sought, with the Company's permission, private medical advice from Doctor McKenzie, ear specialist, who found severely retracted eardrums and blocked tubes. Treatments to unblock, apparently mechanically successful, continued until January 1951 when, on trial flight as passenger, severe ear pains were again experienced. Doctor McKenzie advised the Company that the eustachian tubes were no longer able to adapt to altitude changes and it was not safe for Sigfred to fly. The Company called in an additional specialist who, after examinations, found, as a result of McKenzie's treatments, the tubes open but recommended that, because of the history of dizziness, he should not be permitted to fly.

Medically, muscular control of the eustachian tube is essential to permit equalization of air pressure within the middle ear on both sides of the eardrum. If the tube does not open and the pressure remains unequalized for a long enough period, difficulties result including dizziness and pain. A cold markedly aggravates, disturbance of the tubes, and

the recurrent attacks of airotitis media brought on by forced flying when medically unfit caused permanent damage to the eustachian tubes. Sigfred's " *   *   * disability was caused by continued irritation of his eustachian tubes, through repeated flying, at times when they had not completely recovered from their first disorder in December 1949. *   *   *"

This history has relevance as establishing, with judicial finality, a disability not only caused initially by employment but in fact made permanently severe because of the manner in which the employee's complaints and conditions were treated.

6. So-called from: Moore v. Illinois Cent. R. Co., 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089, which allowed employee, treating employment at an end, to sue for wrongful discharge, the Railway Labor Act, as such, not requiring pursuit of remedy before Railway Adjustment Board; and

Slocum v. Delaware, L. & W. R. Co., 339 U.S. 239, 241, 70 S.Ct. 577, 94 L.Ed. 795; Order of Ry. Conductors of America v. Southern Ry. Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811, holding that Railway Adjustment Board is invested with exclusive jurisdiction to determine disputes or grievances concerning interpretation or application of contracts in non-Moore situations.

if any, under Section 25 for salary during disability and not that of wrongful discharge [7] as such.

But Moore, in the light of Slocum, is not to be read so narrowly. Where the relationship of carrier and the concerned employee (either an individual or a group involved) exists, all disputes concerning the interpretation or application of the contract are exclusively within the province of the Adjustment Board for in such cases, "its settlement would have prospective as well as retrospective importance to both the railroad and its employees, since the interpretation accepted would govern future relations of those parties * * *," Slocum v. Delaware, L. & W. R. Co., supra, 339 U.S. at page 242, 70 S.Ct. at page 579. But where that relationship has ceased to exist, whether from rightful or wrongful cause so long as accepted and final, the controversy becomes a very narrow one: What is owed to this former employee? That interpretation of the contract is inevitably required is not decisive for Slocum recognizes, "If a court in handling such a [Moore] case must consider some provision of a collective-bargaining agreement, its interpretation would of course have no binding effect on future interpretations by the Board", Slocum v. Delaware, L. & W. R. Co., supra, 339 U.S. at page 244, 70 S.Ct. at page 580. Slocum intends that where the controversy is one in which the consequence of a court action is, or may be, to substitute a judicial agency for the Statutory Adjustment Board in the continuing superintendence and nurture of labor relations in the industry, it is then clearly beyond the pale. But where the impact is confined to the requirement that, in the court judgment, a carrier pay or not pay to a *former* employee a specified sum, this will have, if at all, only remote influence on future industrial relations. It would in no way involve the displacement [8] of one, or one group, for another, cf. Slocum v. Delaware, L. & W. R. Co., supra; Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318; Washington Terminal Co. v. Boswell, supra, the increase in rate or determination of pay for work performed by employees, cf. Order of Ry. Conductors of America v. Southern Ry. Co., 339 U.S. 255, 70 S.Ct. 585, 94 L.Ed. 811; and, as precedent it would not be binding on the Board, see Slocum, supra, in adjudication cases (so-called minor cases, cf. Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886); and, in negotiations for future contracts, it would be irrelevant in the function of the Mediation machinery, General Committee of Adjustment of Brotherhood, etc. v. Missouri-Kansas-Texas R. Co., 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76; General Committee of Adjustment, etc. v. Southern Pac. Co., 320 U.S. 338, 64 S.Ct. 142, 88 L.Ed.

---

**7.** Sigfred's reply brief states: "* * * Sigfred's action below was not for wrongful discharge, but was for breach of Section 25 * * *. Admittedly * * * Pan American had a right to discharge him when on his own admission he had become physically incapacitated * * *."

**8.** Suits after discharge seeking *reinstatement* and back pay are of course forbidden: Switchmen's Union of North America v. Ogden Union Ry. & Depot Co., 10 Cir., 209 F.2d 419; Broady v. Ill. Cent. R. Co., 7 Cir., 191 F.2d 73; Buster v. Chicago, M., St. P. & P. R. Co., 7 Cir., 195 F.2d 73; Van Zandt v. Railway Express, D.C.S.D.N.Y., 99 F.Supp. 520; Kendall v. Pennsylvania R. Co., D.C.N.D.Ohio, 94 F.Supp. 875;

Cf. Butler v. Thompson, 8 Cir., 192 F. 2d 831; Brooks v. Chicago, R. I. & P. R. Co., 8 Cir., 177 F.2d 385.

This includes employees displaced by union shop requirements (1951 Amendment 45 U.S.C.A. § 152): Alabaugh v. Baltimore & Ohio R. Co., 4 Cir., 222 F.2d 861, certiorari denied 350 U.S. 839, 76 S.Ct. 77, and cases cited from 9th, 7th, 6th Circuits.

Likewise suits to establish seniority are forbidden: Brotherhood of Locomotive Firemen, etc. v. Central of Georgia, 5 Cir., 199 F.2d 384; Colbert v. Brotherhood R. R. Trainmen, 9 Cir., 206 F.2d 9; Starke v. New York, C. & St. L. R. Co., 7 Cir., 180 F.2d 569; Spires v. Southern Ry. Co., 4 Cir., 204 F.2d 453.

85; Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61.

## II.

As a Moore claim, the Railway Labor Act did not deprive the court of jurisdiction to hear it or require an administrative finding as a prerequisite to the filing of the suit. But such remedy was sought in fact. Of what significance is that?

This depends, initially at least, on the policy of Florida. Transcontinental & Western Air, Inc., v. Koppal, 345 U.S. 653, 73 S.Ct. 906, 97 L.Ed. 1325, conditions a Moore suit upon compliance with any existing state policy requiring the exhaustion of administrative remedies. If the state law demands exhaustion of the administration remedy, the suit, even though Federally permitted, cannot be maintained.[9]

Did Florida require exhaustion of the administrative remedy? We think that, under the circumstances of this case, Mountain v. National Airlines,[10] Fla. 1954, 75 So.2d 574, 577, answers this in the affirmative and in doing so thus applied the traditional Florida view, Ervin v. City of North Miami Beach, Fla., 66 So.2d 235; DeCarlo v. Town of West Miami, Fla., 49 So.2d 596, and the most recent case Morrison v. Plotkin, Fla.1955, 77 So.2d 254. Moreover this is the view which the trial judge, familiar with Florida law, took in dismissing the original Civil Action 3774 in 1951.[11] Of course Pan American cannot assert here that the action of dismissal of 3774 was wrong, or that Sigfred should have sought to upset it by an appeal.

9. Sigfred's suit, Moore and Koppal are each diversity actions. Koppal treats the contract of employment as a "Missouri contract," a factor not discussed specifically in our case. The ALPA agreement here is completely silent on the place of execution delivery of the contract.

10. A suit for declaratory judgment to determine whether (a) strike-breaking pilots were "employees" and whether, if employees, (b) they had to exhaust their contract remedies. The court refused to enter declaratory judgment on the first as it was plain they were employees and rejected the latter as parties are not permitted to use declaratory relief to advise them on the procedural steps to be taken. The Court had pointed out that for wrongful discharge, if the employee sought reinstatement and back wages, it was necessary to pursue the remedy before the Adjustment Board, but, as in Moore, had the right to treat employment at an end and sue for wrongful discharge. Since that election was the first requirement and the pleadings there reflected that the pilots had made no such decision, the court said, "Until the necessary election is made by the plaintiff-appellants, and a claim for relief in accordance therewith attempts to be stated, we can see no useful purpose in further consideration of the problem." Of course the "problem" referred to is whether, once a decision is made to go the Moore route, Florida, as did Missouri, would require allegation and proof of exhaustion of the contract-statutory grievance machinery method.

11. See Court's findings this case: " * * Suit No. 3774 was dismissed, the Court holding that the jurisdiction should be declined until the plaintiff has exhausted his remedies under the agreement (the same contract known in this present suit as Exhibit No. 1), and the Railway Labor Act, or elects his statutory or Common Law remedy for breach of contract for wrongful discharge."

Of course this was not a Mountain v. National Airlines, Inc., situation, since C.A. 3774 sought determination that Pan American now owed salary under § 25 (a). The filing of that suit, seeking that relief, was itself the exercise of the "election" to pursue the Moore route. It would have been a vain thing to have dismissed C.A. 3774, so that the plaintiff could determine whether he wished to file a suit seeking Moore (not Slocum) judicial relief. The trial judge, in his memorandum rescinding an order in the present suit erroneously dismissing the Complaint on defendant's motion, referring to his prior dismissal of C.A. 3774 reflects this also: "The plaintiff has exhausted the administrative remedies *necessary* and here pursues his remedy for breach of contract." (Emphasis supplied.)

## III.

Since Sigfred was required, either by Florida law, or by reason of an authoritative decision which Pan American is not now free to question applying Florida law, to pursue his remedy through the System Adjustment Board, it is evident that, in assaying its impact upon his rights, the so-called "election" was not voluntary, that is, one resulting from his free choice. But as I view it, this coercive [12] characteristic need not alone be decisive here.

If, as Koppal holds, the Railway Labor Act does not pull a Moore case out of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, to determine suability, I think it likewise follows that the state law will also determine the scope and force of the mandated administrative action. Florida law declares that, unless the proceeding is a Florida statutory arbitration, a par-

ty to an arbitration proceeding may have an unlimited right of court review on asserted errors of law. Glens Falls Ins. Co. v. Gulf Breeze Cottages, Inc., Fla., 38 So.2d 828. See Steinhardt v. Consolidated Grocery Co., 80 Fla. 531, 86 So. 431; Hanover Fire Ins. Co. v. Lewis, 28 Fla. 209, 10 So. 297.

Indeed, so strong is this Florida policy against ousting the courts of jurisdiction, that even assuming the pursuit of the administrative remedy was, in a legal sense, voluntary, the Florida courts would still be open for review of errors of law.[13]

Of course, in a very real sense the System Board of Adjustment was actually a board of arbitration which, under the agreement and by statute, was conceived as a bipartisan agency with deadlocks or impasses to be resolved by the naming of a "neutral referee." The provision in the supplemental agreement

---

12. Koppal might indicate a paradox which, with Moore and Slocum, further complicates strategic and tactical problems confronting counsel: If the state law requires exhaustion of remedies, the election is not voluntary and hence not binding (or not *as* binding); if state law does not require exhaustion of remedies, pursuit is voluntary and hence binding. In the former, the "necessity" might thus become an empty, time-consuming, useless act, and, as not binding, be in express conflict with the Act which states it to be final.

13. Our decision in Michel v. Louisville & N. R. Co., 5 Cir., 188 F.2d 224, was rendered in 1951 prior to Koppal (1953) which introduced, for the first time, the state law in Moore cases as the test for exhaustion and significance of administrative remedies. In neither Michel nor Bower v. Eastern Air Lines, 3 Cir., 1954, 214 F.2d 623, was state law (Louisiana and Pennsylvania) shown to permit, as does Florida, court review. This, as well as some additional factors, distinguishes other pre-Koppal cases: Charman v. Pan American Airways, 9 Cir., 188 F.2d 875; Reynolds v. Denver & Rio Grande Western R. Co., 10 Cir., 174 F.2d 673; Hartley v. Pan American Airways, D.C.N.D.Cal., 98 F.Supp. 247; Hecox v. Pullman Co., D.C.W.D.Wash., 85 F.Supp. 34; Berryman v. Pullman

Co., D.C.W.D.Mo., 48 F.Supp. 542, 543; Ramsey v. Chesapeake & O. R. Co., D.C.N.D.Ohio, 75 F.Supp. 740; Farris v. Alaska Airlines, Inc., D.C.W.D.Wash., 113 F.Supp. 907; Kelly v. Nashville, C. & St. L. Ry., D.C.E.D.Tenn., 75 F. Supp. 737.

Moreover, Michel, unlike our present case, was the completely voluntary assertion before the Board of an obvious Slocum case seeking Slocum relief—reinstatement. His suit was thus an attempt to change from Slocum to Moore, and, being in no sense an appeal or quasi-appeal from the Board's Slocum decision, the prior determination of the fact of rightful discharge was binding on the usual rationale of res judicata or estoppel.

See also the recent (October 19, 1955) opinion of the Supreme Court of Florida, Flaherty v. Metal Products Corporation, 83 So.2d 9, 10: "By common law doctrine, which has been recognized by this court, parties to a contract are unable to make an irrevocable agreement to arbitrate all future controversies. Such agreement is said to be contrary to public policy and obnoxious to the law in that it seeks to oust courts of jurisdiction. Steinhardt v. Consolidated Grocery Co., 80 Fla. 531, 86 So. 431; Fenster v. Makovsky, Fla.1953, 67 So.2d 427."

establishing the System Adjustment Board (see footnote 4, *supra*) that decisions should be final is, of course, an implied characteristic of arbitration agreements and would not exempt this action from the Florida policy.

### IV.

If I am correct under I, II, III, the intrinsic merits are open to us and the court below for some character of review. I believe this same result follows if we assume it was a Slocum, not a Moore, case. Of course, in this approach the right of review must be found either expressly in the Railway Labor Act or by necessary, fundamental implication. I find no express right of review. The Board's award, denying, not granting, money relief, and in favor of, not against, the carrier is not reviewable under 45 U.S.C.A. § 153 First (m) or (p).[14]

But I think that if a controversy is of a nature which requires administrative determination by the Board of Adjustment, there must be some character of judicial review to test whether such

action afforded a proper respect for basic guaranties inherent in our system of law.

I am aware, of course, of numerous expressions attributing positive finality to the Adjustment Boards' actions, and which take this to be a closed matter. The fact is, however, that the Supreme Court has at least twice taken specific pains to leave the question open. Most pointedly was this done in footnote[15] 7 in Slocum v. Delaware, L. & W. R. Co., supra [339 U.S. 239, 70 S.Ct. 580].

"We hold that the jurisdiction of the Board to adjust grievances and disputes of the type here involved is exclusive.[7]

"7. * * * Nor are we called upon to decide any question concerning judicial proceedings to review board action or inaction."

Elgin, J. & E. Ry. Co. v. Burley, supra, 325 U.S. at pages 719, 720, 65 S.Ct. at pages 1287, 1288, was another, and its affirmance by an equally divided court of Washington Terminal Co. v. Boswell,[16] 75 U.S.App.D.C. 1, 124 F.2d 235.

---

14. "(m) * * * and the awards shall be final and binding upon both parties to the dispute, except insofar as they shall contain a money award."

"(p) If a carrier does not comply with an order * * * of the Adjustment Board * * * the petitioner, or any person for whose benefit such order was made, may file in the district court * * * a petition."

Mr. Justice Frankfurter, in his dissent in Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 760, 65 S.Ct. 1282, 1307, 89 L.Ed. 1886, 1914, on a point not challenged by the majority, stated: "* * * But the determination here in controversy does not 'contain a money award' so as to be excepted from the final and binding effect given other awards. The obvious meaning of 'money award' is an award *directing* the payment of money, not one *denying* payment * * *." (Emphasis supplied) Accord: Reynolds v. Denver & Rio Grande Western R. Co., 10 Cir., supra.

15. Mr. Justice Reed, dissenting, refers to Footnote 7: "From this I take it that the Court means only to hold that the

Board has what might be called exclusive primary jurisdiction and that the decision is to have no implications for later cases which might pose the issue of judicial review of Board 'action or inaction'."

16. Boswell was a declaratory suit by a carrier challenging the validity of a money award by the Adjustment Board. Holding that the carrier had an adequate right of legal review in resisting the suit brought by the employee within two years, 45 U.S.C.A. § 153 First (p, q), the suit was dismissed. Judge, later Justice, Rutledge for the majority implied that were no such opportunity available to test the award, it would be unconstitutional. At least four Justices must have thought that was inadequate for a carrier. The other four could have been of the view that no review of any kind was needed, or that, for a carrier in that situation, there was an adequate right to contest the employees' Petition to enforce filed within two years. See also Dahlberg v. Pittsburgh & L. E. R. Co., 3 Cir., 138 F.2d 121, and, Alabaugh v. Baltimore and Ohio R. Co., 4 Cir., supra, 222 F.2d at pages 866, 867.

affirmed 319 U.S. 732, 63 S.Ct. 1430, 87 L.Ed. 1694, indicates that the issue is substantial.

We would not have to mark out the full limits of the review. It is sufficient here to permit reappraisal of the construction of a written contract to determine whether, on the contract, there has been an error of law. I think this much is assuredly required. If not, substantial and vital rights are imperiled or may be lost altogether. And this must be determined in the light of actuality, reflecting no real, free, deliberate relinquishment of the right of recourse to all legal protection by the employee. Under the Act the employee must be represented by a union. If he desires to work in transportation (rail or air), he is compelled to work under the contract negotiated for him. The Act requires that the union and carrier establish compulsory grievance machinery, and that contract disputes, failing agreement, must be heard and determined by a Board.

A person's contract of employment covering his compensation for work done and, nowadays, all of those so-called fringe benefits relating to sickness and health payments, accidents, hospitalization, retirement and pension rights as well, is a vital right. Applied literally, the Act forces a person to commit every question as to the very existence, scope or application of that right to an agency having no standing as an official arm of the executive, legislative, or judicial branch of government.[17]

As we are not foreclosed by prior decisions or the contract,[18] I adhere to the fundamental conviction that with rights so vital some suitable means must be available to determine whether the agency to which Congress has committed the parties to resolution of their differences has adequately adjudicated the controversy.

But the court declines to permit any review. Indeed, it ignores the problem altogether. The result is that, out of the countless situations one can now think of, in which the heavy hand of Government determines the very economic existence or survival of an activity, the railway-airline employee *vis-a-vis* railroad-airline employer is the sole[19] one in which no judicial review whatever is afforded.

In New Orleans Public Belt R. R. Commission v. Ward, 5 Cir., 182 F.2d 654, we likewise, by two to one dismissed a similar declaratory suit by a carrier.

17. The parties are denied even the protection of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. See Section 1001. " * * * Except as to the requirements of section 1002 of this title, there shall be excluded from the operation of this chapter (1) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them * * *."

18. The parties have not lost this fundamental right by their contract. The contract provision, (footnote 4, supra) of finality, par. 3(L), is contractually modified by par. 3(N), preserving all rights, etc., under the Act; and the Act, 46 U.S.C.A. § 184 expressly limits the agreement and the Board to the Act:

"It shall be the duty of every carrier and of its employees, * * * to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title * * *."

19. The following are a few of many examples in which the right to carry on some trade or business, or to do (or not do) some particular act is controlled by statute or committed by statute to determination by some administrative agency [cf. a Railway Adjustment Board] and in each, judicial review is afforded:

The one closest is, of course, determination of good faith bargaining for collective bargaining contract and all other related problems, including hiring, discharging, disciplining, pay, working conditions for employees under Labor Management Relations Act, 29 U.S.C.A. § 151 et seq., with decisions by National Labor Relations Board reviewable fully in Courts of Appeal, § 160.

A carrier, rail, motor or water, seeking a Certificate of public convenience and necessity, 49 U.S.C.A. §§ 1, 306, 905, 909, or contract carrier permit, 49 U.S.C.A. §

The Adjustment Board mechanism is in no sense voluntary. It is forced on employer and employee alike. Government cannot compel people to resort to such a tribunal for the irrevocable determination of issues which go to the heart of life itself, unless some means is afforded to test the elemental correctness of it. Justice Brandeis, St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 740, 80 L.Ed. 1033, phrased it:

> "The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied and whether the proceeding in which facts were adjudicated was conducted regularly. To that extent, the person asserting a right, whatever its source, should be entitled to the independent judgment of a court on the ultimate question of constitutionality."

The need for this is as great for the railroad-airline as it is for the employee and, indeed, I would here be championing the same cause had the Adjustment Board held for, rather than against, Sigfred's construction of the contract.

## V.

The review which I hold must exist may, at least, take the form of the suits brought here for declaratory relief or for the recovery of the money value of the benefits sought and denied. Procedural niceties can be wrought out as necessary within the broad framework of suitable actions brought in courts having requisite jurisdiction presenting, without unreasonable delay, the basic propriety of the Adjustment Board's decision.

The scope of that review can likewise be fashioned. Here it is sufficient if it has the minimum capacity to review an asserted plain error of law in the construction of a written contract.[20] The troublesome questions on the reviewability of controverted fact issues, the use or nonuse of a concept of substantial evidence, the problem of administrative expertise on inferences from uncontradicted evidence are points for determination at a later day.

## VI.

I come then finally to the question: Was the Adjustment Board's decision that Section 25(a) did not require payment of salary during continuance of this occupation disability correct? In brief,[21] Sigfred contends that the salary

---

309, or seeking to prevent grant of rights to a competitor, or enforcement of adverse tariff rates, etc., 49 U.S.C.A. §§ 6, 15, 16, has judicial review of Interstate Commerce Commission orders and decisions, 28 U.S.C.A. § 1336.

Similarly for decisive orders of Civil Aeronautics Board, issuance certificates, tariffs, etc., 49 U.S.C.A. §§ 422, 481, 483, are reviewable, 49 U.S.C.A. § 646; for radio and television station permits or denial to competitor or threatened competitor, 47 U.S.C.A. §§ 303 et seq., 402; for licenses to construct, operate interstate gas and oil pipe lines, electricity rates, dams, etc., by Federal Power Commission, 15 U.S.C.A. §§ 717a to 717u, see 717r, 16 U.S.C.A. §§ 797(e) and 824, 825l; licensing operation and rates of packers and stockyards, 7 U.S.C.A. §§ 192, 193, 194, 211, 212, 213, 216, 217; issuance, underwriting of securities, approval or disapproval, cease and desist orders,

etc., 15 U.S.C.A. §§ 77a to 77bbbb, 78a to 78jj, review 78y; alteration of bridges over navigable waters, 33 U.S.C.A. §§ 511 to 523, reviewable 520; Postal Department orders restricting use of the mails, 39 U.S.C.A. §§ 259, 732, see Reilly v. Pinkus, 338 U.S. 269, 273, 70 S.Ct. 110, 94 L.Ed. 63; unfair trade practices, investigations, cease and desist orders by Federal Trade Commission, 15 U.S.C.A. §§ 45, 46, 52–56, 68 to 68j, 71–77, reviewable 45(c, d); regulations for standards of identity, quality and containers for drugs and foods, cease and desist and permits for processing certain foods, orders by Food and Drug Administration, 21 U.S.C. A. §§ 301, 341, 344, 355, reviewable 371 (f), 355(h).

20. Here the questions so troublesome to judges and lawyers, see VI, infra, were determined by laymen, at least three of whom were pilots.

payable under sentence [3] relates to sentence [1]; Pan American, on the other hand, insists that sentence [3] relates only to sentence [2], non-occupational injury or illness away from the pilot's base station, and that the provision for the continuance of salary is permissive within the sole discretion of the Company under sentence [4], Section 25(b).

On the basis of this analysis, construction of the contract is, to be sure, most difficult. However, I think that the fine, technical, intrinsic analysis of the Company cannot stand against the absurdities which would result, and that Sigfred's construction is, on the whole, the more reasonable one. The majority opinion oversimplifies the matter to suggest that arbitrators "could not easily have yielded to a construction that would require the Company to pay a pension of the full sum of $13,440.00 annual salary to all pilots who no longer meet rigid flight medical require-ments for as long as their disability exists." This ignores the requirement of the contract of *"occupational* sickness or injury" and, here, the fact which *res judicata* charges to Pan American that its own actions may well have been the cause of his final permanent incapacity. I would think—since the majority has undertaken to assay its business reasonableness—such a result was hardly to be described as unexpected.

This is not the case of a manual laborer. Here the contract dealt with persons having responsibilities and duties of those of near executive status. Airline pilots have exclusive care of equipment of millions of dollars in value and a serious responsibility for the safety and lives of forty to sixty people at one time. In terms of responsibilities committed to their judgment, I would doubt that management of independent business enterprises would, in many cases, exceed that of the Captain on a modern airliner. Yet these businesses

21. (References are to sentences as numbered [ ] footnote 1, supra.) The Company maintains that upon intrinsic analysis Sigfred's construction cannot be sustained. It argues that [3] must refer only to [2] non-occupational sickness or injury away from home base, because the term "during such period" in [3] being in the singular can refer to one event only, either that in [1] or [2] and of these, it must be [2] for only in [2] is there a statement in terms of a period of time, namely, "While on assignment at a point other than the pilot's base station." The Company bolsters this by pointing out that for Sigfred's construction to be consistent, [4] must refer to non-occupational sickness or injury only, whereas in terms it makes no distinction between occupational and non-occupational.

In reply to these contentions, Sigfred asserts that if [3] refers to [2] and is thus limited to non-occupational sickness or injury, then the provision in [3] that Workmen's Compensation must be paid back to the Company is superfluous. But this cannot be decisive since Sigfred faces the same difficulty in maintaining that [4] applies to non-occupational only, for then the similar provision of [5] would likewise be superfluous. Sigfred suggests an answer for each: The Company, as was the case here, may consider an injury to be non-occupational which the Commission later holds is compensable.

As a telling and principal argument, Sigfred points out that if, as the Company maintains, [3] refers to [2] and [4] applies both to occupational and non-occupational, then absurd results necessarily follow: pilots away from the base station will not be entitled to salary if their sickness or injury is occupational (for example, a severe crash through no personal fault) but are absolutely entitled to it if the sickness or injury is non-occupational (applying [3] to [2]); pilots with occupational sickness or injury away from the base may not get salary, yet if the occupational sickness or injury is at the home base where the need for salary is minimized, they may get it ([4] construed to cover occupational and non-occupational). As thus construed the salary benefits are available when the need is least and unavailable when needed most.

Section 28, Workmen's Compensation, offers little intrinsic help. By its reference to §§ 29, 30 (prisoner, internment, missing, etc.) and sentences [3] and [5], § 25 it is clear that both recognized that obligations for illness/injury would frequently exceed the limited benefits under compensation Acts; but since state or federal law would require compliance (see Florida laws footnote 5 supra, Longshoremen's Act, 33 U.S.C.A. §§ 901, 904, 914, 932, 938), provision should be made for credit to prevent double benefits.

recognizing the inevitable deficiencies in workmen's compensation schemes, Social Security, or the like, frequently provide for service-connected-disability payments approximating former income. My view is that reasonableness is not for us to determine—but if it is, I cannot escape the feeling that if a business makes a person physically unfit to work, it is quite reasonable for it to *agree* to shoulder the responsibility.

The question would then be: did they so agree? With considerable uncertainty, I think they did. But the important thing is that that question ought to have been reviewed directly and affirmatively by a court and, on appeal by an appellate court.

That question has, at best, been only obliquely answered by judges to whom our system accords the right and duty to determine questions of law.

I therefore respectfully dissent.

Rehearing denied; BROWN, C. J., dissenting.