[Civ. No. 11551.    Third Dist.    Mar. 29, 1968.]

STATE OF CALIFORNIA ex rel. STATE PUBLIC WORKS BOARD, Plaintiff and Appellant, v. JUGO COVICH, as Executor, etc., et al., Defendants and Respondents.

Thomas C. Lynch, Attorney General, and James M. Sanderson, Deputy Attorney General, for Plaintiff and Appellant.

Desmond, Miller & Desmond and Richard F. Desmond for Defendants and Respondents.

PIERCE, P. J.—The appeal is by the State of California, plaintiff in a proceeding in eminent domain. The property condemned consisted of fractional lots improved by two old apartment houses located on "O" Street between 14th and 15th Streets in Sacramento. Condemnation was for use in connection with the Capitol Master Plan. The case was tried to a jury which awarded the condemnees $120,000. The state's

motion for a new trial was denied. It appeals from the judgment.

The sole contention on appeal is that the condemnees' two appraisers who appraised the property jointly fixed values contrary to law, speculatively and as of a date 3 years subsequent to the date of trial.[1]

As is not unusual the two experts produced by the state appraised the value of the property at approximately one-half of the value placed upon it by the two condemnees' experts. One of the former fixed its value at $57,000, the other at $63,000. Condemnees' appraisers jointly reached the same sum: $120,000. Indicative of the fact that the science of real estate appraisal is not now an exact science is that both sides presented experts who used the same basic methods of appraisal, reaching widely disparate results.

Both the state's and condemnees' experts started with the fundamental and venerable rule, the early expression of which by our Supreme Court was: "[T]he rule is of universal acceptance that the measure of . . . damage is the market value; that is to say, the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable." (*Sacramento etc. R. R. Co.* v. *Heilbron* (1909) 156 Cal. 408, 409 [104 P. 979].) It has been adopted by Evidence Code section 814 with additional explication as that price "which a willing purchaser and a willing seller, dealing with each other in the open market and with a full knowledge of all the uses and purposes for which the property is reasonably adaptable and available, would take into consideration in determining the price at which to purchase and sell the property. . . ."

Both sides' appraisers also considered what has been referred to as the appraisal "trinity." This combines three methods or "approaches" by appraisers to reach the market value of real estate: (1) the current cost of reproducing the property less depreciation from all sources; (2) the "market data" approach or value indicated by recent sales of comparable properties in the market, and (3) the "income

---

[1]Concededly in this case value must be fixed not as of the date of issuance of summons but as of date of commencement of trial. The suit had been filed August 10, 1964. Trial commenced April 25, 1966. No fault of defendants is contended to have caused the delay. (Code Civ Proc., § 1249.)

approach," or the value which the property's net earning power will support based upon the capitalization of net income. This three-approach means of reaching market value is usually combined. It is stated in American Institute of Real Estate Appraisers, "The Appraisal of Real Estate" (3d ed.) at page 66: ". . . In the majority of his assignments, the appraiser utilizes all three approaches. On occasion he may believe the value indication from one approach will be more significant than from the other two, yet he will use all three as a check against each and to test his own judgment." All three methods have been judicially approved. (*United States* v. *Eden Memorial Park Assn.* (9th Cir. 1965) 350 F.2d 933, 935.) In the "income approach" various techniques are employed. The technique selected will depend upon the belief of the appraiser making the appraisal as to the highest and best use of the subject property. One technique is known as the "building residual" or "gross multiplier" approach. Another is called the "property reversion" or "property residual" approach. The state's appraisers adopted the former approach; the condemnees' appraisers adopted the latter. The state's position is that use of the "property reversion" technique resulted in evaluation of the property three years after the date of trial rather than as of the date of trial. Two statements, one by each of condemnees' appraisers, are taken out of context to support the contention. Since the statements of the two appraisers are substantially the same, use of one of them will suffice. We set it forth in a footnote.[2]

The appraisers' statements only seem like a future evaluation. The fallacy of the state's argument may best be illustrated by an elaboration of the facts. ■■■ The existing improvements on the subject property consist of two old houses remodeled into one bedroom apartments and the owner's living quarters. The state's appraisers envisaged the highest and best use of the property being condemned (con-

---

[2] "We were able to take into consideration the quality of the income being produced and also the factor that a developer would need time to put together an improvement. It takes considerable time to get a working plan, to get your financing and in some cases it's necessary to get leases before you get financing. So that all of these things take a developer considerable time and very often developers will buy property with a good carrier on it to take care of the expenses of the property during the time that they are developing the plan for its reuse.

"And so in this case, we concluded that a developer would like to look three years ahead and at that time the land would be worth $17.00 a square foot three years from now, hopefully by that time the Governor's Mansion would be built. And we discounted this $17.00 by 75 per cent."

ceded to be the basis for consideration in the appraisal of market value—*Hayward Union High School Dist.* v. *Lemos* (1960) 187 Cal.App.2d 348, 351 [9 Cal.Rptr. 750]) to be the continued use of the present buildings for the rest of the life thereof, deemed to be 20 years. Condemnees' appraisers, on the other hand, saw a present value for a higher and better use. It had been stipulated that the area would probably be rezoned from R-5 to C-2. Such rezoning would permit high rise apartment buildings or hotel-motel complexes. Condemnees' experts deemed that to be the highest and best use of the property. In an appropriate "transitional" neighborhood presentation of market values based upon such uses was proper. (*People* ex rel. *Dept. of Public Works* v. *Donovan* (1962) 57 Cal.2d 346, 352-353 [19 Cal.Rptr. 473, 369 P.2d 1].) The state in fact does not on appeal quarrel with the highest and best use adopted by condemnees' appraisers. Nor does it contend here that the "comparable sales" used by those appraisers were improper. Actually, it is the differences between the beliefs of the appraisers of the opposing parties regarding such uses and sales which explain the higher market value fixed by condemnees' appraisers and not their differences as to methods of calculation. We will explain this.

Implicit in the use of "comparable sales," of course, is that the sales compared shall have similarity to the subject property. A factor involved is similarity of location. The subject property is a block from the south boundary of Capitol Park. Close by are the state capitol and several state buildings; also a large modern church and the city's newest hotel. Several blocks away is a freeway in the process of building, part of a system which, when completed, will surround Sacramento. The section directly involved will be completed this year. Benefits to through traffic are not its only purpose. It will also "tie together" the various sections of the city. Fifteenth and Sixteenth Streets (less than one and two blocks respectively east of the subject property) will be principal avenues of approach and departure to and from the freeway. Across the street from the property and to its north, under the *present* Capitol Master Plan, is the proposed governor's mansion. (Since this action the question of relocation may, as appellant's opening brief suggests, have become a stormy controversy.) The improvements on the subject property comprise two old buildings dating back to the era when inadequate levees protecting the city prompted home builders to construct dwellings with stairways to what normally would be

the second story. These buildings are so constructed. The not-. too-recent modernization of the exterior facade has consisted of the application of a white-cake-frosting of stucco. The interior apartments are said to be modern and in excellent condition.

It has been held that it is proper for appraisers in proceedings in eminent domain to take into consideration as "comparable sales" property "adjacent to a rapidly expanding county and city government center." (*People* ex rel. *Dept. of Public Works* v. *Donovan, supra,* 57 Cal.2d 346, 352.)

Condemnees' appraisers selected as the comparable sale upon which they placed greatest reliance, one involving property adjacent to Capitol Park near its northeast corner. Others were used for comparison purposes in the vicinity of the civic betterment projects we have mentioned. We deem this selection to have been one which was properly placed before the jury. Indeed, as stated, we do not understand the state to contend otherwise.

"Comparable sales" are factors in each of the "trinity" of methods of real property appraisal. Our vital concern is with the "income approach," and particularly that technique known as the "property reversion" or "property residual" method. That method was accomplished here through the following steps: the appraisers (1) determined the present value of the raw land as if presently put to the highest and best use; then (2) determined the date when the present use should be terminated; then (3) determined the value of the raw land as of the date described in step (2) above) (4) that value discounted for the period from the present until the date found under step (2) was determined to be the present value of the raw land; they then (5) added thereto the net income flowing from the present use capitalized over the transition period. Using that technique and basing their computations upon the comparable sales selected, the value of the raw land for its highest and best use was determined to be $17 per square foot. That value was fixed both as of the then present time and as of the termination-of-present-use date. That date was fixed at 3 years hence. The appraisers did not believe there would be any material change in the market during that period. Three years was selected because they were of the opinion that would be the period of time it would take the buyer to "put the deal together," i.e., arrange for financing, obtain prospective tenants, etc. The present value of the raw land was obtained by discounting

$17 per square foot over 3 years (utilizing a compound interest factor of 10 percent). That was done by using Table VIII, Present Worth of One Dollar, Compound Interest Valuation Premise For Computing the Value of a Reversion, in The Appraisal Process by George L. Schmutz.[3] (Part VIII, Tables.) The factor given in that table is .7513. Seventeen dollars multiplied by .7513 is $12.77, which the appraisers rounded off to $12.75, which multiplied by the number of square feet involved totaled $112,200 as the value of the land. To determine the value to be added for the income from the improvements, the appraisers took the annual net income of $4,300 per year, used an interest rate of 10 percent, thus obtaining a factor of 2.487, which multiplied by $4,300, and again "rounded out," gave them an improvement value of $10,000. The added land and improvement values were $122,200, the market value computed by the "income approach."

Condemnees' appraisers did not, as the state contends, value the property as of a date 3 years after the trial. What they did was to compute the value of the land (based on past comparable sales) at the end of the estimated feasible life of its present improvements and used this value as a factor in determining present value through the "income approach." Without going into detail appraisal authorities cite and even recommend the "property reversion" or "property residual" techniques as a proper "tool" for use by appraisers "where economic life [of the subject property] is nearing its end." (American Institute of Real Estate Appraisers, The Appraisal of Real Estate (3d ed.) p. 312; see also Crouch, *A Perspective Look at Highest and Best Use,* The Appraisal Journal (Apr. 1966) p. 172.) The Assessors' Handbook (California State Board of Equalization) states at page AH 501-81: ". . . Appraisers have not made much use of the property reversion technique. This is unfortunate because it is one of the simplest and most logical ways of capitalizing income." The same handbook states (p. AH 501-81): "[I]f a good estimate of value of property at some future date can be made, the property reversion technique should be used."

By use of the market data approach and the cost of reproduction less depreciation approach for comparison purposes condemnees' appraisers obtained figures of $110,000 and

[3]The table is the same as Table III, American Institute of Real Estate Appraisers, The Appraisal of Real Estate (3d ed.), appendix D, page 447.

$135,000 respectively as market value. Those figures tend to confirm the $120,000 obtained by the "property reversion" technique under the income approach.

If the joint opinion reached by condemnees' appraisers may be termed "bullish," the opinions of the state appraisers, which envisaged a continued use of this already three-quarters of a century old building for another 20 years, could be said to be "bearish"—at least the jury must have thought so, and we cannot say its determination was unreasonable.

The cases cited by appellant to support its theory that the value fixed by condemnees' appraisers was based upon conjecture (*Central Pacific R.R. Co.* v. *Pearson* (1868) 35 Cal. 247, 262-263; *Sacramento etc. Drainage Dist.* ex rel. *State Reclamation Board* v. *Reed* (1963) 215 Cal.App.2d 60, 64 [29 Cal. Rptr. 847]; *Arnerich* v. *Almaden Vineyards Corp.* (1942) 52 Cal.App.2d 265 [126 P.2d 121]; *Coast Counties Gas & Electric Co.* v. *Miller & Lux Inc.* (1931) 118 Cal.App. 140, 144 [5 P.2d 34]) are so dissimilar on their facts that they need not be reviewed. We do not find here, as we found in the *Reed* case, *supra* (at p. 64), "[e]lements affecting value which are possible but not reasonably probable" and which must "be excluded" for that reason.

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 22, 1968.