**TRAVELERS INDEMNITY CO.,**
**Defendant-Appellant,**

v.

**Orrie L. ARMSTRONG,**
**Plaintiff-Appellee.**

**No. 3–1075A228.**

Court of Appeals of Indiana,
Third District.

Jan. 8, 1979.

608

Winfield L. Houran and John E. Hughes, Clifford, Hoeppner, Houran, Wagner & Evans, Valparaiso, for defendant-appellant.

George W. Douglas and James H. Douglas, Douglas, Douglas & Douglas, Valparaiso, for plaintiff-appellee.

HOFFMAN, Judge.

Orrie L. Armstrong (plaintiff-appellee; Insured) owned a farmhouse which suffered severe interior fire damage on October 10, 1972. A policy of insurance issued by the Travelers Indemnity Company (defendant-appellant; Travelers) provided coverage for the house to a limit of $15,000. A Travelers' claims adjuster surveyed the damaged premises and estimated the cost of repairs necessitated by the fire. When Travelers offered to pay to the Insured an amount of money substantially less than the estimated cost of repairs, she refused the offer and brought this action alleging breach of contract and deceitful, fraudulent and oppressive conduct.

The jury returned a verdict for the plaintiff which included compensatory damages in the amount of $8,729.62 and punitive damages of $25,000. As stipulated by the parties, the trial court computed interest at the rate of 8% per annum on the amount of the compensatory damage award. The court then entered judgment on the verdict. Travelers appeals that judgment.

The facts most favorable to the judgment and the reasonable inferences logically flowing therefrom disclose that Orrie L. Armstrong was the owner of an old farmhouse located one mile west of Hebron, Indiana. Mrs. Armstrong and her husband, John, who died in March of 1971, lived in the house for twenty years and raised a family there. While living in the house the Armstrongs made various improvements to the home including the installation of a new furnace, kitchen cabinets and aluminum siding. The Armstrongs moved into a new home after John Armstrong retired, but they retained ownership of the farmhouse, which was rented to a family with six children.

Orrie Armstrong continued to modernize the farmhouse after her husband's death. These improvements included: the addition of two closets; the installation of hardwood paneling and ceiling tile to the living room, dining room, and four, second-floor bedrooms; and new floor tile in the dining room. Orrie Armstrong testified that the house was in very good condition.

In July 1971, Orrie Armstrong renewed for three years a farmowners insurance policy issued by the Travelers Indemnity Company, through the John R. Eppl Insurance Agency of Hammond, Indiana. Prior to the renewal date Eppl advised the insured to increase the amount of coverage applicable to the farmhouse because the cost of building materials had escalated. The coverage was raised accordingly to a limit of $15,000.

On the afternoon of October 10, 1972, fire caused extensive interior damage to the farmhouse. Within a day the Insured notified her agent of the loss. On October 16, 1972, Wayne Bognar, a claims investigator for Travelers, and Mike Corgich of General Repair Contractors inspected the damaged premises in order to estimate the cost of repair and restoration occasioned by the fire. Bognar and Corgich surveyed each room noting all items which required replacement, repair, painting or cleaning.

Within a week Bognar telephoned the Insured and told her that the estimated cost of repair was $8,729.62. Bognar offered to pay approximately $4,200 cash to the Insured if she chose not to repair, or $6,400 to a contractor if the Insured were to repair the house. Orrie Armstrong asked Bognar to explain the offer, and he responded that he did not understand it himself except that there "was something . . . in the policy that was percentage-wise" and the property was not sufficiently insured to take care of it (cost of repair).

The Insured refused the offers and commented to Bognar, in effect, that she was getting less than a fair deal. The Insured then retained an attorney.

The Insured testified that Wayne Bognar dealt with her courteously, although she disagreed with the settlement offered by him.

Robert S. McGinley had 39 years of banking experience in Hebron, Indiana. For a period of 20 years prior to the fire, McGinley had appraised property in the Hebron area on the average of two or three times a week. McGinley and another appraiser made an inspection of the farmhouse following the fire. The purpose of the inspection was to determine the value of the damaged house and to estimate the cost of restoring the house to a livable condition. McGinley noted that the house was seriously damaged and all the rooms required extensive repair as a result of the fire damage. Based on his past experience McGinley roughly estimated the cost of repair to be $8,500. The estimated value of the house exclusive of the land before the fire was $15,000. The estimated value of the house after the fire was $6,500. McGinley expressed the opinion that fire damage decreased the value of the house by the amount of money necessary to repair the damage.

Wayne Bognar testified that he and a contractor thoroughly inspected the damaged premises. Based on that inspection the estimated cost of repair necessitated by the fire was $8,729.62. This estimate was admitted to be fair and reasonable and was the sum of the following components:

| | |
|---|---|
| Material | $1,688.45 |
| Labor | 5,465.61 |
| Profit, Overhead, Taxes | 1,575.56 |

Bognar stated that he mistakenly adjusted this claim under an inapplicable policy provision which caused him to offer a settlement choice to the Insured. It was Bognar's opinion that the policy authorized a payment to the Insured of no more than $4,288.58, because the condition of the house warranted a 50% across-the-board depreciation reduction.

A supervisor for Travelers, Kevin Weinberg, contacted the Insured's attorney by letter on June 1, 1973. Enclosed with the letter was a draft in the amount of $6,497.22 for repairs to the Insured's dwelling. The letter explained that this figure was determined by reducing the original repair estimate by a 25% across-the-board depreciation factor so as to avoid betterment of the one-hundred-year-old house. Weinberg opined that a depreciation reduction of only 25% produced a very just and fair offer to the Insured. The offer was refused, and the draft was returned.

The initial disclosure of the attempted depreciation reduction was made by Travelers in the June 1, 1973, letter, more than seven months after the fire.

ISSUES: [1]

The judgment of the trial court is comprised of three parts: compensatory damages, interest thereon and punitive damages. The appellant alleges that the judgment is, in all parts, contrary to the evidence and contrary to law. Appellant also claims error in the admission of certain testimony and in the trial court's giving and failing to give certain tendered instructions.

## I. COMPENSATORY DAMAGES

The loss payable clause in the contract at bar states:

". . . [T]his Company . . . to an amount not exceeding the amount(s) above specified, does insure the Insured . . . to the extent of the actual cash value of the property at the time of the loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss . . . against all DIRECT LOSS BY FIRE . . . ."

1. Issues presented by the appellant which involve common questions of law and fact have been combined for the purpose of discussion.

It is undisputed by the parties that the contract did not contain a coinsurance clause or a pro rata clause.

The Travelers Indemnity Company accurately claims that its liability under the policy is limited to the actual cash value of the direct loss by fire suffered by the insured plaintiff. Nevertheless, the phrase "actual cash value" is nowhere defined in this policy of insurance, and the parties to the contract have disputed its meaning.

Travelers argues that actual cash value, as used in this policy, means replacement cost—minus—depreciation. The Insured contends that actual cash value is an expression in monetary terms of the full direct loss by fire as contemplated by the concept of indemnity and the insurance contract. The Insured further contends that a deduction for depreciation is not factually supported in this case, and to hold otherwise would produce a result far short of indemnity.

■ An insurance contract is prepared and drafted solely by the insurance company subject to no real bargaining and, thus, is a contract of adhesion. *Freeman v. Commonwealth* (1971), 149 Ind.App. 211, 271 N.E.2d 177 (transfer denied) 259 Ind. 237, 286 N.E.2d 396. Therefore, when a court is required to interpret an insurance contract, the ambiguities will be construed against the insurer and in favor of the insured. *Id.* An insurance contract is ambiguous if reasonably intelligent men, upon reading the contract, would honestly differ as to its meaning. *O'Meara v. American States Ins. Co.* (1971), 148 Ind.App. 563, 268 N.E.2d 109. The insurance contract at bar is ambiguous.[2]

■ A fire insurance policy is a contract of indemnity whereby the insurer, in exchange for a money consideration (premium), undertakes to make the insured whole for the loss of insured property caused by fire. *First National Bank v. Boston Insurance Co.* (1958), 17 Ill.App.2d 159, 149 N.E.2d 420; *Butler v. Aetna Ins. Co.* (1934), 64 N.D. 764, 256 N.W. 214. It has also been stated that the "contract of the insurer is not that, if the property is burned, he will pay its market value; but that he will indemnify the assured, that is, save him harmless, or put him in as good a condition, so far as practicable, as he would have been in if no fire had occurred." *Washington Mills Manuf. Co. v. Weymouth Ins. Co.* (1883), 135 Mass. 503, 506–507.

■ Since it is well settled that the concept of indemnity underlies every fire insurance contract, it is clear the indemnity pervasively affects the interpretation and operation of loss payable clauses in such contracts. While Indiana courts have not had occasion to pass on the meaning of the loss payable clause here disputed, courts in other jurisdictions have considered the meaning of the phrase "actual cash value" in the context of similar contracts and factual settings.

In *Fedas v. Insurance Co. of State of Pennsylvania* (1930), 300 Pa. 555, 151 A. 285, the Supreme Court of Pennsylvania reviewed an action on a fire insurance policy for the partial destruction of a dwelling and household goods. The clause in the policy was identical to that in the case at bar except the measure of loss was "'[a]ctual cash value (ascertained with proper deductions for depreciation) . . . .'" Notwithstanding the mention of depreciation in the policy, the court held that actual cash value means what it would cost to replace a building or a chattel at the date of the fire. The court reasoned that in the case of a partial loss the determination of actual cash value must consider the use and function of the property and its integral position in an entire structure. Since the policy contemplates a recovery sufficient to repair or replace the property as nearly as possible to the condition as of the date of the fire, the payment of a lesser amount would defeat the essential indemnifying purpose of the policy. *See, e. g.: Farber v. Perkiomen Mut. Ins. Co.* (1952), 370 Pa. 480, 88 A.2d 776; *Metz v. Travelers Fire Ins. Co.* (1946), 355 Pa. 342, 49 A.2d 711.

**2.** *See:* 45 C.J.S. Insurance § 915.

In *Glens Falls Ins. Co. v. Gulf Breeze Cottages* (1949), Fla., 38 So.2d 828, the Florida Supreme Court considered the measure of indemnity for a loss to a ten-year-old roof caused by hailstorm and hurricane. The court said actual cash value meant the amount of money required to make the most economical repairs so as to place the roof as nearly as possible in the same condition existing before the loss, without allowing depreciation for materials used. *See also: Sperling v. Liberty Mutual Insurance Company* (1973), Fla., 281 So.2d 297, (fire loss).

Travelers offers the case of *Braddock v. Memphis Fire Ins. Corp.* (1973), Tenn., 493 S.W.2d 453,[3] to support a deduction for depreciation. The case was a class action suit against numerous insurance companies, wherein the plaintiffs sought to set aside all insurance settlements in which any depreciation factor was employed. The Tennessee Supreme Court acknowledged that a fire insurance policy is a contract of indemnity. The court determined that the replacement cost—less—depreciation formula and the broad evidence rule[4] would operate to accomplish indemnity. It was reasoned that a failure to deduct depreciation would frequently reap a profit for the insured although it could result in a loss. By way of example, the court considered the case of the named plaintiff, Braddock, who suffered a casualty loss which completely destroyed his fifteen-year-old roof. The cost to replace the roof was $247. The court reasoned that if the insured were to recover the cost of a new roof, as contended, he would make a profit on the loss. Hence, the relief sought by the class was denied.

This Court is not persuaded by the reasoning or the rule of the *Braddock* case because it fails to accomplish the essential indemnifying purpose of the insurance contract. Plaintiff Braddock bought insurance protection against casualty. A windstorm destroyed his fifteen-year-old roof, and the cost to replace the roof was $247. His insurance company arbitrarily reduced the estimated cost of replacement by a depreciation factor and then further reduced the settlement by subtracting a $50 deductible amount as provided in the policy. The resultant figure, offered to Braddock in settlement, was $11. While Braddock had a fifteen-year-old roof before the loss, the protection provided by his insurance policy left him with a roofless building and $11 after the loss. Without subtracting the deductible amount, the value of the loss, as contended by Braddock's insurer, was $61. The sum of $61 was insufficient to replace the functional efficiency of Braddock's roof. Thus, the policy, as construed, failed to indemnify Braddock.

The Insured offers the case of *General Outdoor Adv. v. LaSalle Rlty.* (1966), 141 Ind.App. 247, 218 N.E.2d 141. Although this case did not involve a casualty insurance contract, it furnishes guidance to the one at bar. *General Outdoor* considered the proper measure of damages for a nonpermanent (partial) tortious injury to a building with value separate from the real estate. After defining nonpermanent injury to be one wherein the cost of restoration does not exceed the market value of the building prior to the injury, the court held that the proper measure would be the cost of restoration.

**3.** Explaining *Third Nat. Bank v. American Equitable Ins. Co.* (1943), 27 Tenn.App. 249, 178 S.W.2d 915, which offered the following reasoning:

"It would seem that the only practical way to measure the extent of partial damage to a building would be to inventory its damaged parts, and the only way to express such damage in terms of money would be to count the cost of replacing such parts, so as to restore the building to the same condition it was in just before the fire. And the view which we think supported by the better reason and the greater weight of authority is that deprecia-

tion may not be deducted from such cost because that would make the sum insufficient to complete the repairs and would leave the building unfinished; and this would fall short of the indemnity contracted for in the policy." (Citations omitted). 178 S.W.2d 915, at 925.

**4.** An expression of the rule is that the trier of facts may consider any evidence logically tending to the formation of a correct estimate of the value of the insured property at the time of the loss. *McAnarney v. Newark Fire Ins. Co.* (1928), 247 N.Y. 176, 159 N.E. 902.

The reasoning and holding of *General Outdoor* bears some analogy to the facts and circumstances of the case at bar, in that the purpose of the tort remedy is to restore the injured party to the position he occupied before the injury. Likewise, the principle of indemnity seeks a similar result.

■ In order to fairly and reasonably define actual cash value, consideration must be given to the purpose and functional efficiency of the property insured. Without such consideration the intrinsic value of the property would be ignored. *See: Fedas v. Insurance Co. of State of Pennsylvania, supra.*

■ The insurance policy serves to insure against loss not exceeding the amount stated in the policy limit, and the payment of an amount less than the limit, which is not sufficient to restore or replace the functional efficiency provided by the property before the loss, does not comply with the policy. *Id.*

■ The risk of loss underwritten by the insurer is not fixed at the issuance of the policy, rather, the risk is subject to fluctuations wrought by the passage of time and the changes in circumstances affecting the thing insured. As a result, the risk is necessarily affected by changing economic conditions, such as, the increasing costs of labor and materials. Because it is the insurer's undertaking to make the insured whole within the policy limits, the augmented damage resulting from increased costs of labor and materials is the liability of the insurer up to the stated limit of the insurance. *Farber v. Perkiomen Mut. Ins. Co., supra.*

■ Therefore, the phrase actual cash value, within the context of the fire insurance policy in the case at bar, means an amount of money, within the policy limit, sufficient to restore, repair, or replace the property destroyed. *Glens Falls Ins. Co. v. Gulf Breeze Cottages, supra; Fedas v. Insurance Co. of State of Pennsylvania, supra; Third Nat. Bank of American Equitable Ins. Co., supra; Cf.: General Outdoor Adv. v. LaSalle Rlty., supra.*

Travelers alleges the following errors relating to the jury's verdict of compensatory damages:

(1) the jury ignored uncontroverted evidence of depreciation;

(2) the trial court erred by admitting the expert testimony of the plaintiff's appraisal witness;

(3) the verdict is not supported by sufficient evidence;

(4) the jury was erroneously instructed.

■ First of all, it is apparent from reading the record that the evidence of depreciation is not uncontroverted. The facts of record establish that the house was nearly one hundred years old. However, the fire damage was primarily confined to the interior of the house, which had been completely refurbished during the ten-year period preceding the fire, and the majority of the improvements were made within eighteen months of the fire. The Insured testified that the house was in good condition prior to the fire. Her statement conflicts with Wayne Bognar's testimony that the age and condition of the home warranted a 50% depreciation reduction.

It was the responsibility of the jury to weigh and resolve conflicting evidence and to reach a conclusion based upon the evidence they found most credible. *Fruehauf Trailer Division v. Thornton* (1977), Ind. App., 366 N.E.2d 21. Clearly, the jury rejected the testimony of Travelers' claims adjuster. This Court will not disturb that decision.

Robert McGinley, a bank officer in Hebron, Indiana, testified that he and another appraiser surveyed the damaged premises after the fire. McGinley estimated that the fair market value of the house (excluding the land) before the fire was $15,000. Based on his past experience he roughly estimated the cost of repair to be $8,500. McGinley then expressed the opinion that the fire damage decreased the value of the house by the amount of money needed to repair the damage. McGinley also testified that he had appraised property in the He-

bron area on the average of two or three times a week for twenty years. He was familiar with the farmhouse and knew it had been recently remodeled although he had last been inside the house five years before the fire.

Travelers objected to the value opinions stated by McGinley claiming that McGinley was not qualified as an expert because he was not familiar with the condition of the home immediately prior to the fire.

■ The qualification of a witness to testify as an expert is for the determination of the trial court, whose decision will be set aside only where there is manifest abuse of discretion. *McCraney v. Kuechenberg* (1969), 144 Ind.App. 629, 248 N.E.2d 171; *Chicago & Erie R. Co. v. Monesmith* (1941), 110 Ind.App. 281, 37 N.E.2d 724.

In *Isenhour v. State* (1901), 157 Ind. 517, 528, 62 N.E. 40, 44, the court said:

"Courts have never undertaken to set up a standard of scientific knowledge by which the competency of a witness may be determined, and have not gone to the extent of holding that a scientific witness can only testify from facts learned by him from personal demonstration. The general rule in such cases, in this state, at least, seems to be that, where a witness exhibits such a degree of knowledge, gained from experiments, observation, standard books, or other reliable source, as to make it appear that his opinion is of some value, he is entitled to testify, leaving to the trial court, in the exercise of sound discretion, the right to say when such knowledge is shown, and to the jury the right to say what the opinion is worth; and, as in all other cases of discretion, this court will review the action of the trial court only when that discretion clearly appears to have been abused."

■ In view of McGinley's extensive appraisal experience and his general familiarity with the house, it is apparent the objection posed by Travelers is directed at the weight of the evidence. As expressed in *Isenhour v. State, supra,* and numerous other cases, the task of weighing evidence is for the jury. Accordingly, no abuse of discretion has been demonstrated.

Travelers next claims that the verdict is not supported by sufficient evidence.

■ In determining whether a judgment is supported by sufficient evidence, this Court neither weighs the evidence nor resolves questions of credibility. Rather, this Court views only the evidence most favorable to the judgment, together with all logical inferences flowing therefrom. *Rieth-Riley Construction Company, Inc. v. McCarrell* (1975), Ind.App., 325 N.E.2d 844.

■ The jury heard evidence that the fair and reasonable estimate of cost to repair the fire damage was $8,729.62. Other evidence established that the fire damage was confined to the interior of the house, which had been recently and extensively remodeled. An appraiser testified that the fire damage decreased the value of the house by the amount of money necessary to restore the house to its former liveable condition.

There is sufficient evidence in the trial record from which reasonable men could conclude that the insured property was damaged by fire in the amount of $8,729.62.

■ The jury was instructed that the policy of insurance required the defendant to pay to the plaintiff the full direct loss occasioned by fire within the limits of the policy, and the policy contained no provisions which required or authorized a reduction of coverage below the amount of the full direct loss.

Defendant Travelers objected to this instruction calling it "an absolute incorrect interpretation" of the policy. Travelers objected further, claiming the policy says the insurer shall "replace the property with material of like kind and quality within a reasonable time" and that being impossible, the defendant was entitled to a reduction in damages on the basis of unjust enrichment.

Travelers did not tender an instruction on the proper measure of damages but chose, instead, to object to the instruction tendered by the plaintiff. The objection to the

instruction is without merit. The policy does not state that the insurer shall "replace the property . . ." Rather, the policy states that the company insures "to the extent of the actual cash value of the property at the time of the loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality . . . ." Whereas, there was no evidence which established the impossibility of repair with material of like kind and quality, the objection posed by Travelers was properly denied, and no error was committed. There was no error in awarding of compensatory damages.

## II. PUNITIVE DAMAGES

The jury awarded $25,000 in punitive damages to the plaintiff. Travelers claims the punitive award is erroneous for the following reasons:

    (1) the trial court's overruling defendant's motions for judgment on the evidence was error;

    (2) the verdict is not supported by sufficient evidence and is contrary to law; and

    (3) the jury was erroneously instructed.

The following is a summary of facts pertinent to the issues raised by Travelers:

Fire caused severe interior damage to the farmhouse owned by the Insured. The entire property was insured to a limit of $15,000 by the Travelers Indemnity Company. The property had previously been insured for a lesser amount, but John Eppl, an agent for Travelers, advised the Insured to increase the policy limit to guard against the increasing cost of building materials. A claims adjuster for Travelers, accompanied by a contractor, surveyed the damaged premises and determined that the repairs necessitated by the fire would cost $8,729.62. This fair and reasonable estimate was the sum of the cost of materials, labor, taxes, overhead, and profit. In November 1972 the claims adjuster contacted the Insured by telephone and disclosed to her the estimated cost of repairs. He then told the Insured that Travelers would pay

approximately $6,400 to a contractor for repairs or $4,200 in cash to her if she chose not to repair. The Insured, believing the insurance coverage sufficient to pay the entire cost of repair, asked the adjuster to explain his offers. Wayne Bognar, the adjuster, said that he did not completely understand it himself, but there was something in the policy percentage-wise and the insurance was not high enough. He further explained that a policy provision required the reduced offers.

The Insured refused the offers. The same offers were extended in December 1972 and January 1973 and on both dates were refused by the Insured's attorney.

Kevin Weinberg, a Travelers supervisor, contacted the Insured's attorney by letter on June 1, 1973, enclosing therein a draft in the amount of $6,497.22 for repairs to the Insured's dwelling. This figure was determined by reducing the original repair estimate by a 25% across-the-board depreciation factor so as to avoid betterment of the one-hundred-year-old house. The offer was refused, and the draft was returned. This letter marked the first disclosure by Travelers of the attempted depreciation reduction.

Travelers admitted, by written interrogatories read into evidence and by testimony, that there were no policy provisions which required the offers first extended to Mrs. Armstrong.

Travelers moved for judgment on the evidence at the close of the plaintiff's case-in-chief and at the conclusion of all the evidence. Travelers alleges error in the denial of those motions claiming there was absolutely no evidence of oppressive, malicious, or fraudulent conduct.

■ The law is clear in Indiana that a motion for judgment on the evidence (directed verdict) must be denied where there is any evidence or legitimate inference therefrom tending to support at least one of the allegations. Where there is evidence upon which reasonable minds might differ, a directed verdict is improper, and the conflicting evidence should be left for the jury's resolution. *Mamula v. Ford Motor*

*Co.* (1971), 150 Ind.App. 179, 275 N.E.2d 849; Ind. Rules of Procedure, Trial Rule 50.

■ The jury heard evidence which tended to establish a misrepresentation of policy provisions by a Travelers claims adjuster. That evidence was sufficient to avoid a directed verdict.

Travelers next contends that the verdict for punitive damages is not supported by sufficient evidence and is contrary to law. The reasoning advanced to support this contention is that punitive damages are generally not allowed in contract actions. Furthermore, the evidence, as characterized by Travelers, clearly establishes that this case in its entirety is nothing less than a good faith dispute.

■ While it is the general rule that punitive damages are not available in contract actions, there are exceptions to the rule. Where the conduct of a party, in breaching a contract, independently establishes the elements of a common law tort, the assessment of punitive damages for the tort is proper. *Murphy Auto Sales, Inc. et al. v. Coomer et al.* (1953), 123 Ind.App. 709, 112 N.E.2d 589.

Additionally, punitive damages may be awarded "whenever the elements of fraud, malice, gross negligence or oppression mingle in the controversy." *Hibschman Pontiac, Inc. v. Batchelor* (1977) Ind., 362 N.E.2d 845, 847, therein quoting, *Vernon Fire & Casualty Insurance Co. v. Sharp* (1976), Ind., 349 N.E.2d 173; *Taber v. Hutson* (1854), 5 Ind. 322, 324, 61 Am.Dec. 96. However, punitive damages based on mingled tort elements will be proper only where it appears the public interest will be served by the deterrent effect of the punitive damages. *Vernon Fire & Casualty Insurance Co. v. Sharp, supra.*

■ This Court will not reweigh the evidence nor determine the credibility of witnesses but will sustain a verdict if there is any evidence of probative value to support it. *Moore v. Waitt* (1973), 157 Ind.App. 1, 298 N.E.2d 456; *Smart & Perry Ford Sales v. Weaver* (1971), 149 Ind.App. 693, 274 N.E.2d 718.

■ In the present case, the jury reasonably could have found elements of fraud, malice, gross negligence or oppression mingled with the breach of contract. The evidence established that the policy provisions were misrepresented to the plaintiff. Although Travelers claims the misrepresentation was a mistake, there is no evidence which shows that the mistake was admitted or corrected. Furthermore, the offers based on the misrepresentation were twice reaffirmed. Then, seven months after the fire, Travelers advanced another theory to justify a steadfast refusal to pay the estimated cost of repair. Travelers stated that its liability under the policy language was limited to the cost of repair minus a 25% across-the-board depreciation reduction, and they offered an amount so computed to the Insured.

This theory of across-the-board depreciation is outside the bounds of reason and logic. Assuming *arguendo* that the property damaged by fire had diminished in value as a result of age, wear and tear, or inadequate maintenance, that diminution in value would bear no logical relevance to the application of a depreciation factor on the costs of labor, overhead, and taxes included in the estimated repair cost. It would be most unreasonable to contend that the wall paneling and ceiling tile in the plaintiff's house were any less "installed" on the day of the fire than they had been at the precise moment of installation. An additional example of the absurdity resulting from the across-the-board depreciation reduction is demonstrated by the following item contained in the repair estimate:

"ESTIMATED LABOR COST Truck away all debris, and dump fees: $176.00".

According to Travelers it was necessary to pay only 75% of this item and all other labor costs in order to avoid betterment of the house. That is a ludicrous notion, yet it necessarily results from the application of the across-the-board depreciation rationale.

From all the evidence presented the jury reasonably could have concluded that the conduct of Travelers was oppressive and

indicative of a heedless disregard of the consequences, thus supporting the punitive damages award.

Travelers next claims that the trial court erroneously instructed the jury.

■ The trial court gave plaintiff's tendered Instruction No. 1 which reads as follows:

"If you find from a preponderance of the evidence and under the court's instructions that the defendant was guilty of willfully injuring the plaintiff by false representations to the plaintiff concerning the legal effect of the provisions in the insurance policy, and that this conduct was willful, oppressive, malicious, or the statements were made with heedless disregard of their consequences, and that as a result thereof, Mrs. Armstrong was damaged, and if you further find that Mrs. Armstrong is entitled to recover compensatory or actual damages, then you may, also, allow to her exemplary or punitive damages as well.

"Exemplary damages are damages allowed as punishment by way of example and to deter others from committing a like act. If you allow exemplary damages, they may be in such amount as you find sufficient to punish the defendant for its conduct and to act so as to be a deterrent to others."

The defendant made the following objection to the instruction:

"Defendant objects to the giving of plaintiff's tendered instruction No. 1, which purports to be an instruction advising the jury what they can do if they find the defendant guilty of willfully injuring the plaintiff by false representations or willful, malicious or oppressive conduct for the reason that there is not a scintilla of evidence that any of these conditions were present, the uncontroverted evidence being that the plaintiff and defendant had a good-faith dispute about the amount of recovery allowable under a certain insurance policy designated plaintiff's Exhibit No. 1, and the plaintiff sought the courts for remedy in this situation.

Further, the instruction is an erroneous statement of the law, confusing, and will allow the jury to guess and speculate whether or not there was such conduct on the part of the defendant."

The instruction appears to be a fair and adequate statement of the law. Defendant's objection is directed at the weight of the evidence, which is properly the concern of the jury. No error has been demonstrated.

■ Travelers also objected to plaintiff's tendered Instruction No. 3, given as follows:

"You are instructed that you may draw reasonable inferences from the evidence, and fraud need not in every case be proved by positive evidence if facts and circumstances are present from which fraud is inferred."

Defendant's objection reads:

"Defendant objects to the giving of plaintiff's tendered instruction No. 3 for once again there is no evidence of any fraud on the part of the defendant and such fraud must be positively proven and not just inferred as the instruction states, and it is therefore an incorrect statement of the law."

We first note that actionable fraud need not be proved in order to support an award of punitive damages. *Jones v. Abriani* (1976), Ind.App., 350 N.E.2d 635; *Rex Insurance Company v. Baldwin* (1975), Ind. App., 323 N.E.2d 270. Furthermore, this instruction is an adequate statement of the law. *Jordanich et ux. v. Gerstbauer et al.* (1972), 153 Ind.App. 416, 287 N.E.2d 784.

■ Travelers also alleges error upon the trial court's refusal to give two instructions tendered by Travelers. The first instruction related to the effect of a good-faith dispute. The other was confined to the subjects of malice, gross fraud, oppressive conduct, and heedless disregard of the consequences.

No error was committed by the trial court in refusing the instructions tendered by Travelers because the subject matter

therein contained was adequately covered by other instructions. *Chaney v. Tingley* (1977), Ind.App., 366 N.E.2d 707.

### III. INTEREST

■ The parties to this action stipulated and agreed "that in the event the jury returns a Verdict for Compensatory damages the Court *shall* compute interest thereon at 8% per annum." (Emphasis added).

The trial court computed interest in the amount of $1,785.13 and included that amount in the judgment.

Travelers contends that the trial court's award of interest is improper, and in any event, the mathematical computation is inaccurate.

The stipulation effectively removes any question of the legal propriety of the interest award in the present case. Furthermore, since Travelers has wholly failed to demonstrate the mathematical inaccuracy complained of, no error has been shown.

The judgment of the trial court in all matters is hereby affirmed.

Affirmed.

ROBERTSON, J., participating by designation, concurs.

STATON, J., concurs with opinion.

STATON, Judge, concurring.

I concur with the majority opinion, however, I feel that the definition of "actual cash value" needs additional clarification. The majority predicates its definitional rationale upon the indemnity aspect of the insurance policy. It assumes that indemnity necessarily includes a functional restoration of the whole. This definition of "actual cash value" ignores the practical result that a restored interior of a house may have to be accomplished with new materials rather than used materials which may increase the market value of the house. Since the policy did not define "actual cash value" and since an ambiguity existed, the ambiguity was construed against the insurer. Furthermore, depreciation of some structural parts of the interior of a house is unrealistic and at best arbitrary. For example, a handrail to a stairway, a stairway, doors, thresholds, windows, floors, walls, etc. Therefore, indemnity must include functional restoration of the whole within policy limits.