The OHIO CASUALTY INSURANCE
COMPANY, Appellant
(Defendant Below),

v.

Maezell RAMSEY, Appellee
(Plaintiff Below),

and

James T. Thomas, Appellee
(Defendant Below).

No. 2–681A207.

Court of Appeals of Indiana,
Second District.

Sept. 20, 1982.
Rehearing Denied Nov. 9, 1982.

eral and administrative expenses were not such purposes within the language of this statute.

Peter G. Tamulonis, Mark W. Gray, Kightlinger, Young, Gray & De Trude, Indianapolis, for appellant.

Irma Hampton Nave, Anderson, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Defendant-appellant The Ohio Casualty Insurance Company (Ohio Casualty) appeals from a judgment of $11,900 entered in favor of plaintiff-appellee Maezell Ramsey (Ramsey), claiming that the trial court erred in using replacement cost as the standard of recovery under a fire insurance policy insuring Ramsey's destroyed home "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss . . . ."

We reverse.

## FACTS

The record discloses that on November 7, 1979, a dwelling house owned by Ramsey was totally destroyed by fire. A detached garage was left intact. The structures, located at 629 South Gharkey Street in Muncie, were insured under a policy issued by Ohio Casualty and limiting liability

> to the extent of the *actual cash value* of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss . . . .

*Record* at 57 (emphasis supplied).

Ramsey sued Ohio Casualty for $12,000, the face amount of the policy. The sole witness at trial, real estate appraiser Jay E. Allardt (Allardt), testified on Ramsey's behalf as to the value of the destroyed property. He indicated that the cost of replacement would be approximately $16,000 and assessed the fair market value of the loss at

$3,300. The value of the undamaged ten-year-old garage was estimated at $2,800.

Allardt explained the discrepancy between replacement cost and market value of the sixty-year-old dwelling as follows:

Q. You've mentioned that there is a difference between the replacement cost and what the property would actually appraise for.

A. Thats [sic] right.

Q. Can you justify the difference between those two figures?

A. Yes.

Q. And what is that difference?

A. Okay, its [sic], really its [sic] an age old thing, its [sic] a popular conception I think that cost is equal to value and that's not true unless there is [sic] two conditions that are present and one of them is that the property is new which this one is definately [sic] not, the second is that its [sic] the highest and best use of the land and which is arguable on this case, the subject property being located next to the railroad track there and with no visible frontage and so forth on Gharkey Street, with subject to a hugh [sic] amount of whats [sic] known as economic obsolescence and that's from factors outside the property which would be things like visibility, the noise, the vibration from the train, what it comes down to is it would be an undesirable house to buy given other alternatives. Then it is also functionally obsolete in the sence [sic] that if you were going to build a house today and you were going to spend that $18,800.00 [replacement cost of dwelling plus value of garage] we were talking about you wouldn't build a house like that.

Q. You would build it in a more modern fashion then.

A. Yes, the floor plan would be different, there would be more closet space and so forth and um ... what it amounts to is and then you got physical depreciation which is just the wear and tear on the structure of the property the roof isn't as good a [sic] new, the siding is not as good as new, the foundation is not as good as new, the wiring, the plumbing, you could go on and on, none of it is as good as new and so *there's substantial amount of depreciation from physical depreciation, functional obsolescence and economic obsolescence* and those are what bring the value down to what the fair market value was that we estimated at the time.

*Id.* at 140–41. (emphasis supplied).

In entering the following judgment for $11,900—the face value of the policy less a $100 deductible—the trial court apparently interpreted the operative term "actual cash value" as cost of replacement without a depreciation deduction:

This matter having been taken under advisement and the Court having considered the evidence herein and the Memorandum of Law submitted therewith finds that the subject property herein was destroyed by fire that the evidence herein showed that said dwelling cannot be repaired at a cost of less than face value of the insurance herein and that the replacement cost would far exceed the limits of the policy herein and that the plaintiff is entitled to replacement of said property or in the alternative the limits of the policy herein and that the plaintiff is entitled to replacement of said property or in the alternative the limits of liability by the defendant company on the policy of insurance herein therefore the Court finds that the plaintiff is entitled to have and recover from the defendants the sum of $12,000.00 being the limits of liability less $100.00 deductible for a total of $11,900.00 and coasts [sic] all as per decree.

*Id.* at 111.

## ISSUE

A single issue is presented for review: What is the measure of recovery for a total loss of real property covered by a

fire policy limiting the insurer's liability "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss ...?"

## DECISION

PARTIES' CONTENTIONS—Ohio Casualty primarily relies on two cases, *General Outdoor Advertising Co. v. LaSalle Realty Corp.,* (1966) 141 Ind.App. 247, 218 N.E.2d 141, and *Atlas Construction Co. v. Indiana Insurance Co.,* (1974) 160 Ind.App. 33, 309 N.E.2d 810, in urging us to adopt fair market value as the true meaning of the contract term "actual cash value." The trial court's interpretation of "actual cash value" as pure replacement cost, says Ohio Casualty, violates the principle of indemnity upon which insurance contracts are based: Failure to consider depreciation in assessing damages places the insured in a better financial position than he would have been in had no loss occurred.

Ramsey's response is that the trial court's interpretation of the pivotal phrase "actual cash value" as pure replacement cost was proper in light of this court's decision in *Travelers Indemnity Co. v. Armstrong,* (1979) Ind.App., 384 N.E.2d 607. In *Travelers,* which involved a *partial* fire loss to real property insured under a policy whose liability-limiting language was identical to that found in Ramsey's policy, this court interpreted "actual cash value" as replacement cost without a depreciation deduction. Characterizing her loss as partial because the detached garage and land were uninjured, Ramsey argues that the measure of damages announced in *Travelers* is controlling. And she maintains that even if her loss be construed as total, recovery of pure replacement cost is essential to afford indemnity.

■ CONCLUSION—The measure of recovery for a total loss of real property covered by a fire policy limiting the insurer's liability "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss," is the broad evidence rule, under which the fact finder may take into account any evidence tending to establish the true economic value of the insured property.

■ How does one interpret a slippery phrase like "actual cash value?" No Indiana court has yet construed the phrase in the context of an action for damages brought upon a contract of insurance covering real property which has been totally destroyed by fire. But courts of other states have examined the term in this context, and one Indiana court has examined it in the context of a partial fire loss: All agree that the term is ambiguous and therefore subject to interpretation. *See, e.g., Travelers Indemnity Co. v. Armstrong,* (1979) Ind.App., 384 N.E.2d 607. *See generally* Note, *Valuation And Measure Of Recovery Under Fire Insurance Policies,* 49 *Colum.L.Rev.* 818 (1949) [hereinafter cited as *Valuation Under Fire Policies*]. When, as here, contractual ambiguity arises because of language used in the instrument rather than because of extrinsic evidence, construction is a pure question of law. *R. R. Donnelley & Sons Co. v. Henry-Williams, Inc.,* (1981) Ind.App., 422 N.E.2d 353; *Huntington Mutual Insurance Co. v. Walker,* (1979) Ind.App., 392 N.E.2d 1182. A court on appeal will independently evaluate a pure question of law, substituting its judgment for that of the trial court if necessary. *See generally* 4A B. Bagni, L. Giddings & K. Stroud, *Indiana Practice* § 103 (1979). This we proceed to do.

■ As a reviewing court we must ascertain and effectuate the intent of the parties. *Piskorowski v. Shell Oil Co.,* (1980) Ind.App., 403 N.E.2d 838; *Boswell v. Lyon,* (1980) Ind.App., 401 N.E.2d 735. Because a fire insurance policy is a contract of indemnity, the intent of the parties to the policy is to place the insured in the same financial position he would have been in had no loss occurred. *Travelers, supra; Braddock v.*

*Memphis · Fire Insurance Corp.,* (1973) Tenn., 493 S.W.2d 453.

It has been said that in order to indemnify the insured, the term "actual cash value" will be given a meaning which takes into account the character of the insured property and the extent of the loss. Thus, real property is treated differently than personal property, and total losses are treated differently than partial losses. *See generally* 15 *R. Anderson, Couch's Cyclopedia Of Insurance Law* § 54:129 (2d ed. 1966) [hereinafter cited as 15 *R. Anderson*]; Annot., 61 A.L.R.2d 711 (1958).

■ Ramsey would have us view her loss as partial because the detached garage and land were undamaged. Her two-sentence argument, however, is bereft of any citation of authority whatsoever. The argument is therefore waived. *See Midwest Emery Freight System, Inc. v. IMC, Inc.,* (1977) 173 Ind.App. 368, 363 N.E.2d 1078. Nevertheless, we observe without elaboration that under either of the two principal tests by which courts have assessed the extent of property loss in cases such as this, Ramsey's loss was total. *See generally* 15 *R. Anderson, supra* §§ 54:57–:73.[1]

Because Ramsey's loss was total, her reliance on *Travelers, supra* for the proposition that "actual cash value" equals pure reconstruction cost is misplaced. The fire loss in *Travelers* was only partial. In defining "actual cash value" as the cost of reconstruction without a depreciation deduction, the court reasoned that in a partial loss

case, damages must be sufficient "to replace the functional efficiency" of the damaged portion of the insured structure. 384 N.E.2d at 615. Obviously any such consideration is irrelevant when property is totally destroyed and hence not subject to restoration.

Also misplaced is Ohio Casualty's reliance on cases adopting fair market value as the measure of damages for *tortious* destruction of real estate, such as *General Outdoor Advertising Co. v. LaSalle Realty Corp.,* (1966) 141 Ind.App. 247, 218 N.E.2d 141. 15 *R. Anderson, supra,* summarizes it this way:

> The liability of a property insurer is based upon its contract, subject to conditions imposed by a charter or bylaws, or by a constitution, statute, or administrative regulation. From the fact that the insurer's liability is contractual it follows that *in an action for damages brought upon a contract of insurance the provisions of the contract govern the measure of recovery rather than any rules applicable to cases of tort.*

*Id.* § 54:2 (emphasis supplied). *Accord, Stoops v. First American Fire Insurance Co.,* (1930) 160 Tenn. 239, 22 S.W.2d 1038; *Engh v. Calvert Insurance Co.,* (1954) 266 Wis. 419, 63 N.W.2d 831; *Housner v. Baltimore-American Insurance Co.,* (1931) 205 Wis. 23, 236 N.W. 546.

Nor does *Atlas Construction Co. v. Indiana Insurance Co.,* (1974) 160 Ind.App. 33, 309 N.E.2d 810, support Ohio Casualty's position. *Atlas* was an action brought upon a

---

1. Under the "identity" test, a structure is a total loss if it has lost its identity and specific character as a building, although a portion of the materials or component parts remain standing and may be useful for some purpose. *See generally* 15 *R. Anderson, supra* § 54:58. That the insured property in this case was deprived of its essential character as a dwelling house is not disputed. So the uninjured condition of the garage does not preclude a finding that Ramsey suffered a total loss under the "identity" test. And the fact that the land was undamaged is irrelevant: Ramsey's policy did not cover the land on which the destroyed property stood. According to the "restoration-to-use" test, a loss is total if a reasonably prudent owner would not use what remains after a fire as a basis for restoring a structure to its pre-loss

condition. *See generally* id. § 54:62. We are unpersuaded that a reasonably prudent owner desiring a house such as Ramsey's in its pre-loss condition would use the detached garage as a basis for reconstruction.

We might add that this court has defined "permanent" injury to *tortiously* damaged real property as "one wherein the cost of restoration exceeds the market value of the building prior to the injury." *General Outdoor Advertising Co. v. LaSalle Realty Corp.,* (1966) 141 Ind.App. 247, 267, 218 N.E.2d 141, 151. Although rules applicable to tort cases are not binding in this action founded on contract, see discussion *infra,* Allardt's testimony indicates that Ramsey's loss would fall within the definition of permanent injury set forth in *General Outdoor.*

fire insurance policy containing a liability-limiting clause like the one in Ramsey's policy. The policy in *Atlas,* however, provided for appraisal of the plaintiff's loss. The appraiser used fair market value to compute the "actual cash value" of a totally destroyed building. Based upon the general rule that absent fraud or collusion, an appraisal award will not be set aside, we rejected the plaintiff's claim that the appraiser's failure to consider replacement value in assessing "actual cash value" constituted reversible error. In a footnote we added that "even without regard to the finality of the appraisal award, we might well hold under the circumstances that the profferred evidence of Atlas as to replacement cost was properly excluded." 160 Ind. App. at 40, n. 2, 309 N.E.2d at 814, n. 2. This comment, however, was based upon *Wea Township of Tippecanoe County v. Cloyd,* (1910) 46 Ind.App. 49, 91 N.E. 959, a *tort* case in which this court equated "actual cash value" with fair market value.[2] As indicated above, rules applicable in tort cases are not binding in an action for damage brought upon a contract of insurance. And in any event, our endorsement of the fair market value standard in *Atlas* was tentative at best: In text we acknowledged the existence of other standards of "actual cash value," including replacement value and the broad evidence rule. We recognized that "[h]ad the appraisal award here been premised upon some method other than fair market value, such as a 'broad evidence rule', we might well acknowledge such as an appropriate method in Indiana." 160 Ind.App. at 40, 309 N.E.2d at 814.

This leaves us adrift with no Indiana cases on point, so we look elsewhere for a definition of "actual cash value" which will indemnify an insured whose real property has been totally destroyed by fire. First, however, we clarify the meaning of "fair market value," the standard advocated by Ohio Casualty.

Fair market value is the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to consummate the sale. *Second National Bank v. State,* (1977) 174 Ind.App. 168, 366 N.E.2d 694. *See also Southern Indiana Gas & Electric Co. v. Gerhardt,* (1961) 241 Ind. 389, 172 N.E.2d 204; *State v. Jones,* (1977) 173 Ind. App. 243, 363 N.E.2d 1018. In certain areas of the law in which fair market value is the measure of damages, the prevailing rules permit proof of all possible elements of value in establishing market value. In eminent domain proceedings, for instance, Indiana courts allow evidence of "anything affecting the sale value" of the condemned property. *Gerhardt, supra* at 393, 172 N.E.2d at 205. *Accord, Jones, supra.* Specific consideration has been given to three factors or "approaches" in estimating the fair market value of property taken by eminent domain:

(1) the current *cost of reproducing* the property less depreciation from all sources; (2) the *'market data'* approach or value indicated by recent sales of comparable properties in the market, and (3) the *'income-approach,'* or the value which the property's net earning power will support based upon the capitalization of net income. This three-approach means of reaching market value is usually combined. It is stated in American Institute of Real Estate Appraisers. 'The Appraisal of Real Estate' (3d ed.) at page 66: '* * * In the majority of his assignments, the appraiser utilizes all three approaches. *On occasion he may believe the value indication from one approach will be more significant than from the other two,* yet he will use all three as a check against each and to test his own judgment.' All three methods have been judicially approved. (*United States v. Eden Memorial Park Association* (9th Cir., 1965) 350 F.2d 933, 935).

*Jones, supra* at 251–52, 363 N.E.2d at 1024 (quoting *State v. Covich,* (1968) 260 Cal. App.2d 663, 67 Cal.Rptr. 280, 282).

**2.** *Wea* involved a statute permitting recovery of the "actual cash value" of livestock killed by dogs.

Courts in the area of fire insurance law have apparently considered evidence of comparable sales ("market data" approach) as the *sole* criterion of fair market value, rejecting evidence of income ("income" approach) and reproduction costs ("cost of reproducing" approach). *See Jones, supra.* Probably because market value in this limited sense is not the true test of indemnity, most courts have rejected fair market value as the exclusive measure of "actual cash value" under a fire insurance policy such as Ramsey's. *See generally* 15 *R. Anderson, supra* § 54:246; *Valuation Under Fire Policies, supra* at 820; Annot., 16 A.L.R.2d 711, 725–26.

A number of courts have defined "actual cash value" as the cost of replacing the property at the time of loss—less an appropriate depreciation deduction. *See generally Valuation Under Fire Policies, supra* at 821–22; Annot., 61 A.L.R.2d 711, 726–29. Although the provision at issue specifies that the insurer's liability shall not exceed "the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss," courts adopting the replacement-cost-less-depreciation test have, in effect, made the quoted phrase the substantive measure of "actual cash value." *Valuation Under Fire Policies, supra* at 821. One author offers the following analysis of the relative strengths and weaknesses of the test:

> "Property owners in jurisdictions which have adopted the replacement-cost-less-depreciation test are able to estimate accurately the value of property when insuring it.
> *But the inflexibility of this rule is also its most objectionable feature. While it may be appropriate where, as in the majority of cases, the insured property is being used for its intended purposes, the test will result in excessive recovery where the property is obsolete.* Many structures today have a high replacement value because of the inflated cost of building materials even though their true commercial value—represented by rentals, prospective profits, usefulness to the present

owner, location and age—is considerably less. The "moral hazard" [promoting arson by allowing recovery in excess of actual loss] against which the principle of indemnity is directed may, therefore, be increased through the use of the replacement-cost-less-depreciation test."

*Id.* at 821–22 (emphasis supplied).

As the italicized language indicates, courts adopting replacement cost less depreciation as the test of "actual cash value" fail to recognize that under the "cost of reproducing" approach to determining the fair market value of property taken by eminent domain, *Jones, supra,* depreciation is not restricted to physical wear and tear, but has been extended to embrace the effect of obsolescence (loss of adaptability). 4 *J. Sackman, Nichols On Eminent Domain* § 12.313[1] (3d ed. 1981). *See* n. 3, *infra.*

Possibly because the law in this area has traditionally assigned restrictive meanings to the terms "fair market value" and "replacement cost less depreciation," a number of courts in recent years have rejected market value and replacement cost as the exclusive tests of "actual cash value." They have adopted the broad evidence rule, under which the fact finder may consider all available evidence logically tending to establish "actual cash value." *E.g., McAnarney v. Newark Fire Insurance Co.,* (1928) 247 N.Y. 176, 159 N.E. 902; *Lampe Market Co. v. Alliance Insurance Co.,* (1946) 71 S.D. 120, 22 N.W.2d 427. *See generally* 15 *R. Anderson, supra* §§ 54:249–:250; *Valuation Under Fire Policies, supra* at 822–24. In *McAnarney, supra,* a leading case on point, the New York Court of Appeals expressed the broad evidence rule as follows:

> Where insured buildings have been destroyed, the trier of fact may, and should, call to its aid, in order to effectuate complete indemnity, every fact and circumstance which would logically tend to the formation of a correct estimate of the loss. It may consider original cost and cost of reproduction; the opinions upon value given by qualified witnesses; the declarations against interest which may

have been made by the assured; the gainful uses to which the buildings might have been put; as well as any other fact reasonably tending to throw light upon the subject. Sedgwick on Damages, § 722; Wood on Fire Insurance, § 472; *State Insurance Co. v. Taylor,* 14 Colo. 499, 24 P. 333, 20 Am.St.Rep. 281; *Citizens' Bank v. Fitchburg Fire Ins. Co.,* 86 Vt. 267, 84 A. 970; *The H. F. Dimock,* [77 F. 226 (1st Cir.)] supra; *Washington Mills Mfg. Co. v. Weymouth Ins. Co.,* [135 Mass. 503] supra; *Shattuck v. Stoneham Branch R.,* 6 Allen (Mass.) [115] 116; *Swan v. Middlesex Co.,* 101 Mass. 173; Wigmore on Evidence, § 1943.

247 N.Y. at 184–85, 159 N.E. at 905. Thus, in applying the rule, a court may take into account market value, replacement cost, and depreciation. In addition, such factors as location and obsolescence may be considered. *McAnarney, supra, Lampe, supra.*[3] As the court in *Lampe, supra* observed:

> Replacement cost, less physical depreciation, establishes the theoretical present cost of reproducing a particular building. It is not the invariable test of value because in a particular case other factors may overcome or qualify its influence upon sound opinion. Value, after all, is a matter of opinion. *Butler v. Aetna Ins. Co.,* 64 N.D. 764, 256 N.W. 214. It cannot be denied that on occasion such considerations as location and obsolescence will reduce value below reproduction cost. "Actual" cash value will not be arrived at by ignoring such realities.

71 S.D. at 124–25, 22 N.W.2d at 429.

■ The disadvantage of the broad evidence standard is its lack of predictability.[4] But its overriding allure is its ability to aid the fact finder in ascertaining the true economic value of insured property—the objective of indemnity. *Valuation Under Fire*

*Policies, supra* at 824. We therefore adopt the broad evidence rule as the measure of recovery for a total loss to real property insured under a policy containing a liability-limiting clause such as the one in this case.

In so doing, we suggest that every factor considered by appraisers in assessing the fair market value of condemned property merits consideration by the fact finder under the broad evidence rule: Evidence of the cost of reproduction less depreciation and obsolescence, prices comparable properties have brought, and income from the property may be admitted to show the "actual cash value" of insured property. *See Jones, supra.* Furthermore, the trier of fact may properly consider declarations against interest; matters affecting the credibility of witnesses, including valuation experts; and any other evidence which will aid in determining "actual cash value." *See McAnarney, supra.*

■ The trial court, by allowing recovery of pure replacement cost, in effect gave Ramsey the equivalent of a new building for the loss of an old one. In the ordinary fact situation, replacement cost less depreciation may be the chief factor to be considered in applying the broad evidence rule. *See Kingsley v. Spofford,* (1937) 298 Mass. 469, 11 N.E.2d 487. Here, however, Allardt's testimony makes relevant to a determination of "actual cash value" such additional factors as obsolescence and location. We therefore reverse the judgment of the trial court and remand this case for a new trial on the issue of damages. In assessing the amount to which Ramsey is entitled, the fact finder may consider any relevant evidence tending to establish the "actual cash value" of the insured property.

■ A final matter remains to be resolved. In its motion to correct error and on brief Ohio Casualty argues that the trial

---

3. "A structure is obsolete when a reasonable owner would not rebuild it in case of destruction. Obsolescence is caused by changes and improvements in building design or construction or by the presence of other factors which make the use to which the building has heretofore been put impracticable." *Valuation Under Fire Policies, supra* at 824 (citation omitted).

4. For this reason, it has been suggested that replacement cost less depreciation should be the touchstone in the ordinary case, limiting the broad evidence test to unusual fact situations. *Valuation Under Fire Policies, supra* at 824.

court erred in failing to reduce the judgment by $2,400, a sum allegedly paid by Ohio Casualty to Ramsey before trial. The record, however, contains no evidence as to any advance payment of damages. Furthermore, Ohio Casualty's praecipe requested a *complete* record of the proceedings. Consequently, Ohio Casualty has waived its claim of error by failing to establish a proper record in the trial court. Ind.Rules of Procedure, Appellate Rule 7.2(B) and (C). *See Dunn v. State* (1982) Ind., 439 N.E.2d 165 (Hunter, J., concurring in result).

Judgment reversed and case remanded to the trial court for a new trial on the issue of damages.

SHIELDS, J., concurs.

SULLIVAN, J., concurs in result.